**UNITED STATES of America and the State of Washington, Plaintiffs,**

**v.**

**The WESTERN PROCESSING COMPANY, INC., et al.; the Boeing Company, et al., Defendants.**

**The BOEING COMPANY, Third–Party Plaintiff,**

**v.**

**A & A ANDERSON TANK SERVICE, LTD., et al., Third–Party and Cross–Claim Defendants.**

**AMERICAN TAR COMPANY, et al., Third–Party Plaintiffs,**

**v.**

**A & A ANDERSON TANK SERVICE, LTD., et al., Third–Party and Cross–Claim Defendants.**

**Jack and Leah PINCHEV, Third–Party Defendants and Third–Party Plaintiffs,**

**v.**

**UNITED STATES of America, and State of Washington, Third–Party Defendants.**

Nos. C89–214M, C83–252M and C89–224M.

United States District Court, W.D. Washington, at Seattle.

March 22, 1991.

See also 756 F.Supp. 1416.

William A. Gould, Perkins Coie, Seattle, Wash., for Boeing Co.

Marcus B. Nash, Stafford, Frey, Cooper & Stewart, Seattle, Wash., for NW Steel Rolling Mills Inc., and NW Steel Rolling Mills Liquidating Trust.

Frederick O. Frederickson, Michael J. Swofford, Graham & Dunn, Seattle, Wash., for Security Pacific Bancorporation Northwest.

Ronald A. Franz, Carney, Stephenson, Badley, Smith & Spellman, Seattle, Wash., for Liquid Waste Disposal Co.

Garmt J. Nieuwenhuis, pro se.

Glen Andrew Anderson, Atty. General's Office, Torts, Olympia, Wash., J. Tanya Barnett, Laurie Sillers–Halvorson, Attorney General's Office, Ecology Div., Olympia, Wash., Jon Peter Ferguson, Atty. General's Office, Tort Claims Div., Seattle, Wash., for Washington State.

Susan L. Barnes, U.S. Attorney's Office, Seattle, Wash., David W. Zugschwerdt, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, D.C., for U.S.

Peter H. Haller, Ater, Wynne, Hewitt, Dodson & Skerritt, Seattle, Wash., for American Tar Co., Atlantic Richfield Co., Bethlehem Steel Corp., Chevron U.S.A., Inc., Flecto Coatings Ltd., John Fluke Mfg. Co. Inc., Heath Tecna Aerospace Co., Morton Thiokol Inc., Pacific Propellor Inc., Safety Kleen Inc., Seattle Times Inc., Pittsburgh & Midway Coal Mining Co., Western Pneumatic Tube Co., and Nortar Inc.

Jeffrey B. Wihtol, Portland, Or., Peter H. Haller, Ater, Wynne, Hewitt, Dodson & Skerritt, Seattle, Wash., for American Tar Co.

Larry Bruce Alexander, Seattle, Wash., for Widing Transp. Inc.

John R. Allison, Betts, Patterson & Mines, Seattle, Wash., for Crosby & Overton Inc.

Lisa M. Stone, Stoel, Rives, Boley, Jones & Grey, Seattle, Wash., Kevin Q. Davis, Stephen S. Walters, Stoel, Rives, Boley, Jones & Grey, Richard D. Bach, Portland, Or., for Precision Castparts Corp., International Controls Corp. and Radiation Intern.

Marc A. Bateman, Richard M. Barney, Jr., Barney & McAdams, Seattle, Wash., for Ace Galvanizing Co. and Pontius Trucking.

Richard John Watkins, Cable, Langenbach, Henry, Watkins & Kinerk, Seattle, Wash., for Ryan & Haworth Co.

James Morton Beecher, Hackett, Beecher & Hart, Seattle, Wash., RSR Corp. and Scott Galvanizing Co., Inc.

Robert Farnum Bakemeier, Jeffrey Wayne Leppo, Jeanette DiScala McGraw, Bogle & Gates, Seattle, Wash., for Lockheed Shipbuilding & Const. Co., and Davis Walker Corp.

Clark J. Davis, Davies Pearson P.C., Tacoma, Wash., for Bayside Waste Hauling & Transp. Co.

Robert Jerome Grenier, Seattle, Wash., for Amalgamated Services Inc.

Victoria Jensen Bjorkman, Lawrence E. Hard, LeSourd & Patten, P.S., Seattle, Wash., for Union Oil Co. of Cal., GATX Tank Storage Terminal Corp., Northwest Tank Service, and Canadian Forest.

Jerry H. Kindinger, James M. Shaker, Sharon J. Bitcon, Ryan, Swanson & Cleveland, Seattle, Wash., for Lee & Eastes Tank Lines, Inc., Inland Transp. Co., Inc., Pay 'N Save Corp., and South Center Oil, Inc.

John P. Lycette, Jr., Seattle, Wash., for National Transfer, Inc.

Richard Lee Sessions, Seattle, Wash., for Scott Galvanizing Co., Inc.

Benjamin Gould Porter, George, Hull & Porter, Seattle, Wash., for Color Tech, Inc., and Asko Processing, Inc.

Joel Sherwood Summer, Univar Corp. Legal Dept., Seattle, Wash., for Univar Corp. and Pacific Resins & Chemicals, Inc.

Scott A. Smith, Short, Cressman & Burgess, Seattle, Wash., for Tree Island Steel Co., Ltd.

Terence K. McGee, Thomas Anderson Sherwood, McGee & Reno, Seattle, Wash., for Continental Can Co.

Robert J. Downey, Law Offices of John Lockie, Seattle, Wash., for Norfin, Inc.

Norfin Inc., Donald L. Sneelman, c/o Herb Lakefish, NF Corp., pro se.

C. Stan Webert, Seattle, Wash., for Coastal Tank Cleaning Services, Inc.

William D. Maer, Heller, Ehrman, White & McAuliffe, Seattle, Wash., for Anchor Post Products, Canron, Inc., and Westak–North.

Shane Cornelius Carew, Ronald A. Franz, Carney, Stephenson, Badley, Smith & Spellman, Seattle, Wash., for Quigg Bros–McDonald, Inc., Jack Pinchev and Leah Pinchev.

Preston Niemi, Seattle, Wash., for A J Zinda Co.

Dennis Smith, Janet E. McKinnon, Wilson, Smith, Cochran & Dickerson, Jeffrey Lynn Carey, Seattle, Wash., for Pozzi Bros., and Lumber Trucking Service.

James T. Johnson, Seattle, Wash., for Tacoma Hauling, Inc., Tacoma Hauler/Gunter Bros. and Tacoma Hauling/Jack Creager Trucking.

Gary Michael Abolofia, Bellevue, Wash., for Culligan Water Service.

Robert Farnum Bakemeier, Jeffrey Wayne Leppo, Jeanette DiScala McGraw, Seattle, Wash., for McMillan Bloedel.

William A. Helsell, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash.

David Utevsky, Cynthia R. First, Foster Pepper & Shefelman, Seattle, Wash., for Hearst Corp.

## ORDER DENYING GATX'S MOTION FOR SUMMARY JUDGMENT AND GRANTING BOEING'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST GATX

McGOVERN, District Judge.

### INTRODUCTION

The issues addressed in this order arise from several motions.

First, GATX moved for summary judgment. Boeing then responded by filing its own cross-motion for partial summary judgment against GATX. GATX then filed its reply in support of its own motion and responding to the arguments made in Boeing's Response/Cross–Motion. Boeing then filed its reply.

GATX then filed its motion to strike exhibits to Boeing's reply brief, or alternatively for leave to file supplemental pleading, i.e., the memorandum in support of the motion to strike.

The Court will first summarize the arguments presented then proceed with its analysis and conclusion.

### MOTION OF GATX

GATX seeks dismissal from this lawsuit, dismissal of the claims against it with prejudice, and judgment pursuant to Fed.R. Civ.P. 54(b). This summary judgment is sought based on GATX's contention that petroleum was the only GATX-generated waste that ended up at Western Processing, and the Comprehensive Environmental

Response Compensation and Liability Act (CERCLA) specifically excludes such waste from its coverage.

GATX contends that the sludge consisting of petroleum residue, sand, and rust from its petroleum storage tanks, which was removed by Ryan & Haworth, a tank cleaning company, and disposed of at Western Processing, is excluded from CERCLA coverage by the "petroleum exclusion."

The exclusion of petroleum is found in the definition section where the term "hazardous substance" is defined:

> ... The term [hazardous substance] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance....

42 U.S.C. § 9601(14).

GATX argues that the petroleum exclusion applies to petroleum and all of its components and additives, citing *Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801 (9th Cir.1989). The *Wilshire* court analyzed the plain meaning of the statute, post-enactment legislative history, and the EPA's interpretation to arrive at its conclusion:

> We rule that the petroleum exclusion in CERCLA does apply to unrefined and refined gasoline even though certain of its indigenous components and certain additives during the refining process have themselves been designated as hazardous substances within the meaning of CERCLA.

881 F.2d at 810. The Court reasoned that, pursuant to the standards of statutory construction,

> the petroleum exclusion requires us to exclude gasoline, even leaded gasoline, from the term "hazardous substance" for purposes of CERCLA. Any other construction ignores the plain language of the statute and renders the petroleum exclusion a nullity.

881 F.2d at 804. The court also noted that the Superfund Amendments and Reauthorization Act of 1986 (SARA), created a separate response program for petroleum leaking from underground storage tanks.

Thus, under these authorities, argues GATX, since it only produced petroleum waste that was deposited at Western Processing, it should be dismissed from this case. After dismissing the federal claims, the court will then lack jurisdiction over the pending state claims, and they should be dismissed as well.

MOTION OF BOEING

Boeing argues that GATX's motion should be denied because GATX's wastes were sludge and rinse water containing hazardous substances, and not petroleum; GATX's wastes are thus not subject to the petroleum exclusion.

While the *Wilshire Westwood* court may have reasoned that gasoline was included in the petroleum exclusion, even though it contained components that are designated hazardous substances under CERCLA, Boeing argues that

> neither the Ninth Circuit in *Wilshire Westwood* nor any other court has ever applied the petroleum exclusion to a substance that was not primarily a useable petroleum product such as fuel or oil. In fact, even useable petroleum products that have some market value, such as waste oil, have been found to fall outside of the exclusion. *See Washington v. Time Oil Co.*, 687 F.Supp. 529, 532 (W.D. Wash.1988).

Boeing contends that GATX's wastes were not useable petroleum products and that they contained certain hazardous substances. Ken L. Haworth, the former president of the company that transported GATX's wastes to Western Processing testified that the sludge and washwater were not useable products. (Haworth dep. at 18, 28.)

Boeing points to an EPA interpretation in a Final Rule published April 4, 1985 stating:

> EPA interprets the petroleum exclusion to apply to materials such as crude oil, petroleum feedstocks, and refined petroleum products, even if a specifically listed or designated hazardous substance is present in such products. However, EPA does not consider materials such as waste oil to which listed CERCLA sub-

stances have been added to be within the petroleum exclusion.

50 Fed.Reg. 13,460, attached as Exhibit B to Starrs affidavit.

Boeing cites two cases where courts have found the petroleum exclusion inapplicable to oil-related wastes containing hazardous substances: *New York City v. Exxon Corp.*, 744 F.Supp. 474, 31 Env't Rep.Cas. (BNA) 1963 (S.D.N.Y.1990) (oil/water emulsion that averaged roughly 5% oil and contained lead, cadmium, and chromium. *Id.*, at 477, 489–90, 31 Env't Rep.Cas. (BNA) at 1964, 1976); *City of Philadelphia v. Stepan Chemical Co.*, 17 Chem. Waste Lit.Rep. 667, 1988 WL 136530 (E.D.Pa.1988) (residue from a process involving the refining of fuel oil to produce synthetic gas; Court concluded there was a genuine issue of material fact concerning the presence of hazardous substances in part because the generator's waste may have been mixed with other hazardous substances. *Id.* at 669).

Boeing argues that even if GATX's wastes could be considered petroleum, which they are not, they would not fall within the petroleum exclusion because they contained hazardous substances that (a) are not normally found in gasoline and (b) are in concentrations higher than normally found in gasoline.

Boeing points to a memorandum dated July 31, 1987 wherein the EPA's Office of General Counsel concluded that "contaminants" in petroleum are not within the petroleum exclusion. (Exhibit E to the Starrs affidavit.) The EPA defined "contaminants" as "substances not normally found in refined petroleum fractions or present at levels which exceed those normally found in such fractions." EPA Memorandum at 1. *See also New York City v. Exxon Corp.*, 744 F.Supp. 474, 489, 31 Env't Rep. Cas. (BNA) 1963, 1976 (S.D.N.Y.1990) (quoting the EPA Memorandum). Boeing states that the EPA memorandum should be given considerable deference by this Court because the Ninth Circuit in *Wilshire Westwood* specifically referenced this memorandum when it stated that "the EPA's interpretation of the scope of the petroleum exclusion is entirely consistent with its plain meaning and legislative history and constitutes highly persuasive evidence that our interpretation is correct." 881 F.2d at 808.

Most of GATX's sludge, approximately 67 drums, came from leaded gasoline tanks, 12 from a diesel oil tank, and some amount from an unleaded gasoline tank. (Supp.Ans. of GATX, Exhibit F to the Starrs affidavit.) The sludge was removed, and the tanks were washed to clean out the remainder. (Haworth Dep. at 26.)

The sludge contained a rust-like scale of corrosion products from the oxidation of steel in the tank walls. (Haworth dep. 17–19; and other deps., listing omitted.) Because the steel tanks contained chromium, nickel, and other metals, this scale contained oxides of chromium, nickel, and other metals. (Meyer Affidavit at ¶ 12.) Chromium and nickel are listed as hazardous substances under CERCLA. Gasoline typically contains little or no chromium and nickel, and here, gasoline is not the source of the chromium and nickel oxides. Thus, the sludge contained hazardous substances not normally found in refined petroleum fractions.

Additionally, argues Boeing, the rust-like scale of corrosion products in GATX's sludge also contained occluded carbon from the steel tank walls. (Meyer Affidavit at ¶ 13.) Because carbon adsorbs, or attaches to, other substances, the scale contained adsorbed compounds of lead and polynuclear aromatic hydrocarbons ("PAHs"). *Id.* Lead and PAHs are listed hazardous substances under CERCLA. 40 C.F.R. § 302.4 (Exhibit I to Starrs Affidavit.) The concentrations of PAHs in the sludge exceed the norm for refined petroleum fractions. (Meyer Affidavit at ¶ 13.) The diesel oil sludge contained a higher concentration of PAHs because diesel oil itself contains a heavier concentration of these heavy elements. (Meyer Affidavit at ¶ 17–18.) The unleaded gasoline tanks corrode more slowly, but produce the same oxidation of the metallic components of steel.

Boeing argues that GATX's wastes are similar to wastes specifically listed or designated as hazardous substances. Such petroleum wastes specifically listed by the EPA are leaded tank bottoms from the petroleum refining industry. *See* 40 C.F.R. § 261.32 (referring to listing K052). Leaded tank bottoms are the wastes generated from cleaning out leaded gasoline tanks. API Survey at 4–4. Although the listing refers only to tank bottoms from petroleum *refining*, the tank bottoms from petroleum *storage* present the same toxicity concerns that prompted the EPA to list this waste.

The EPA's Listing Background Document for petroleum refining wastes, justifies the listing of leaded tank bottoms because "[s]olids formed as products of corrosion and rust in the tanks contain toxic metals, and are periodically removed. This waste is being listed because it contains lead." *Id.* at 690. (Exhibit K to Starrs Affidavit.) This statement referring to refining tank bottoms, matches the description of GATX's storage tank bottoms. (Meyer Affidavit at ¶¶ 9–14.) There is no indication that EPA wished to distinguish between refining and storage tank bottoms, and there is no technical reason to distinguish between the two and consider storage tank bottoms as falling within the petroleum exclusion.

Boeing addresses legislative history referring to the EPA Memorandum earlier mentioned, which states: ... "Congress had no intention of shielding from Superfund response and liability hazardous substances merely because they are added, intentionally or by use, to petroleum products." (EPA memo at 6.) The primary purpose of the exclusion was to remove "spills or other releases strictly of oil" from CERCLA's scope. *Exxon Corp.*, 744 F.Supp. at 490, 31 Env't Rep.Cas. at 1976 (quoting S.Rep. No. 96–848, 96th Cong., 2d Sess. 29–30 (1980)). The *Exxon* Court concluded:

> Clearly, though Congress intended to exclude oil spills from the coverage of CERCLA, Congress did not intend to exclude waste oils such as Alcan's which are by no means strictly "crude oil or any fraction thereof."

*Id.* Here, argues Boeing, the waste sludge and washwater is even further removed from the petroleum exclusion than waste oil, which is at least arguably a useable petroleum product. GATX's wastes are not strictly "crude oil or any fraction thereof." GATX is a liable party who acknowledged that its wastes were taken to Western Processing by a transporter.

REPLIES

*GATX Reply*

While most of the facts are not in dispute, states GATX, Boeing's expert, Dr. Eugene Meyer has alleged without evidence that GATX's sludge contained chromium and nickel from the rust in the storage tanks. GATX contends that its tanks were made of carbon steel that contains no chromium or nickel. (Deposition of Donald E. Miller at 22, line 11; affidavit of Richard E. Poulson at ¶ 5.)

GATX argues that petroleum sludge and petroleum wash water are fractions of petroleum. GATX contends that sludge is the fraction of petroleum which settles to the bottom of the tank in which petroleum is stored, and petroleum wash water is sludge greatly diluted by water.

Under the statute's plain meaning as discussed in *Wilshire Westwood,* even though gasoline contains lead, it is still excluded from CERCLA coverage. Likewise, petroleum sludge must be excluded, because petroleum is always stored in steel tanks, and both petroleum and petroleum sludge always pick up rust and other constituents from the steel tanks in which they are stored. (Poulson Affidavit at ¶ 6.) Otherwise, the petroleum exclusion would be rendered a nullity.

GATX distinguishes Boeing cases as not involving petroleum sludge, but instead involving petroleum to which additives had been added during use. GATX also refers to a quote from Senator Simpson who stated that the exclusion includes oil tank bottoms. (132 Cong.Rec. S14, 932 (Daily Ed. Oct. 3, 1986)).

GATX argues that the EPA intends CERCLA's petroleum exclusion to include

petroleum sludge. GATX quotes from the EPA Memorandum were the EPA's general counsel concluded that petroleum and its fractions come within the petroleum exclusion unless contaminants are added to it during use. (Exhibit E to Starrs affidavit.) GATX argues that the EPA approvingly cited a portion of the earlier Superfund Bill wherein "oil" was defined to mean petroleum, "including crude oil or any fraction or residue therefrom." (EPA Memorandum at 6, n. 4.) So, GATX argues, oil "residue" under the old bill means petroleum residue under the new bill. GATX argues that because petroleum sludge comes from the normal separation that occurs in the storing of petroleum and because rust is normally mixed with petroleum, failure to include petroleum sludge within the petroleum exclusion would strip that exclusion of its meaning.

*Boeing Reply*

Boeing argues that GATX has not rebutted the argument that its wastes are sludge and washwater, not petroleum, and that they contain levels of hazardous substances above what would normally occur in petroleum products.

GATX argues that its wastes are fractions of petroleum. Boeing argues, however, that a standard chemical dictionary defines petroleum fractions as usable petroleum products which are derived by 'cracking' or distilling crude oil. *See Hawley's Condensed Chemical Dictionary,* 540, 892 (11th ed. 1987). *Hawley's* also states that the most important petroleum fractions, obtained by cracking, include various hydrocarbon gases, naphtha, gasoline, kerosene, fuel oils, gas oil, lubricating oils, paraffin wax, and asphalt. *Id.* 892. The GATX sludge is not obtained by the distillation process; rather, it is a mixture of corrosion products (primarily rust) and solids that settle from the petroleum products stored in the tanks. The GATX sludge is not a product of distillation and does not fit the definition of a petroleum fraction.

Concerning Senator Simpson's statement during Congressional debates on SARA, the EPA, charged with developing and administering CERCLA's regulatory program, rejected Senator Simpson's view. EPA regulations specifically list "tank bottoms (leaded) from the petroleum refining process" as hazardous substances falling outside of the exclusion. *See* 40 C.F.R. § 261.32 (referring to listing K052). These properly promulgated regulations control over the stated views of one legislator.

GATX's effort to characterize *Wilshire Westwood* as determinative of the issue herein is still unavailing, argues Boeing, as GATX's sludge is not gasoline or gasoline with additives, but is nonuseable nonpetroleum waste contaminated with the hazardous constituents of petroleum and by other hazardous substances. Neither CERCLA, EPA regulations, or any court case supports GATX's claim that contaminated wastes having no marketable value as petroleum products fall within the petroleum exclusion.

Concerning GATX's criticism of Boeing's cited case law, Boeing agrees that the cases do not involve sludge, but present a closer question because they involved *petroleum products,* albeit products that had become contaminated. They involved contaminated oil slicks, PCB's in waste oil, which (as GATX has acknowledged) the congressional debates clearly indicate were intended to fall outside the petroleum exclusion. Here the wastes in question are contaminated wastes, not petroleum products. The CERCLA exclusion does not apply.

Boeing argues that GATX has not rebutted Boeing's evidence that GATX's sludge contained concentrations of PAHs and lead exceeding those normally found in refined petroleum fractions, nor can it. GATX argues that any reading of the petroleum exclusion that does not include petroleum sludge simply because of increased levels of PAHs from the rust in the storage tanks would render the petroleum exclusion a nullity. But this reading has been adopted by the EPA and upheld by the Courts:

> We believe that an interpretation of "petroleum" to include only indigenous, refinery-added hazardous substances is the interpretation of this provision which

is most consistent with Congressional intent. The language of the provision, its explanation in the legislative history, and the Congressional debates on the final Superfund bill clearly indicate that Congress had no intention of shielding from Superfund response and liability hazardous substances merely because they are added, intentionally or by use, to petroleum products.

EPA memorandum at 6; *see also, Exxon,* 744 F.Supp. at 490. That this renders the petroleum exclusion a nullity was rejected by EPA:

[T]he argument has been made that this interpretation narrows the petroleum exclusion to the extent that it has become virtually meaningless.... However, this interpretation leaves a significant number of petroleum spills outside the reach of CERCLA. Spills or releases of gasoline remain excluded from CERCLA under the petroleum exclusion.

EPA memorandum at 9.

Since GATX has not rebutted Boeing's evidence of elevated concentrations of PAHs and lead in its wastes, Boeing is entitled to summary judgment.

GATX has attempted to rebut evidence that GATX's sludge contained chromium and nickel oxides through the affidavit of its expert, Richard Poulson. Poulson states that other petroleum tanks that he has examined were made of carbon steel containing no chromium and nickel, that he is not aware of any steel petroleum storage tanks made with chromium or nickel, and that he finds it unlikely that a company would use steel tanks with chromium or nickel because these are expensive metals. He does not say, however, that he has examined GATX's tanks or that he knows they are not made with chromium or nickel. Former GATX employee Donald Miller refers to the tanks as "carbon steel tanks," but did not testify as to the constituents of the steel. Moreover, information regarding the precise constituents of GATX's tanks is peculiarly within the knowledge of GATX, but it has not made this information available to Boeing. Boeing has established that "[s]teel is an alloy of iron having from 0.02 to 1.5% carbon by weight and various other additives. The most common additives in steel are chromium and nickel, although tungsten, molybdenum, manganese, vanadium, cobalt and zirconium are also common components." (Meyer Affidavit at ¶ 11.) In *United States v. Hayes,* 369 F.2d 671, 676 (9th Cir.1966), the Court stated:

It is well settled that in the interest of fairness the burden of proof ordinarily resting upon one party as to a disputed issue may shift to his adversary when the true facts relating to the disputed issue lie peculiarly within the knowledge of the latter.

Thus, under these circumstances, argues Boeing, the Court could properly find that GATX's steel tanks contained chromium and nickel.

GATX's leaded tank bottom sludge is indistinguishable from the leaded tank bottoms specifically listed as hazardous substances by the EPA, and Boeing argues that this argument has not been rebutted.

Moreover, Boeing argues that an EPA Memorandum discussing the toxicity of materials in underground storage tanks states that "[t]he wastes from the interior of the tank [which] include unrecovered product, water, sludge, scale, etc., *are presumed to be hazardous.... The only method to remove the presumption is to test the waste for the characteristics of a hazardous waste."* (Memorandum from Chet McLaughlin to John Heffelfinger at 2 (December 13, 1990), attached at Exhibit C to the Supp. Affidavit of Thomas Starrs; emphasis added by Boeing.) The wastes from underground petroleum storage tanks are indistinguishable from waste from aboveground petroleum storage tanks such as GATX's, argues Boeing. GATX's wastes should be presumed hazardous. GATX not having overcome the presumption, its wastes should be considered hazardous substances under CERCLA, concludes Boeing.

Boeing concludes that since GATX has not rebutted factual assertions precluding application of the petroleum exclusion, the Court should find that GATX's wastes con-

tain hazardous substances as defined in Section 101(14) of CERCLA, that GATX is a liable party, and Boeing should be granted summary judgment with respect to GATX's liability.

## ANALYSIS

The GATX tank bottom sludge is a contaminated waste product, and not a petroleum fraction, as that term is used in the statute. This conclusion is consistent with EPA memoranda on the subject of "tank bottoms."

### 1. EPA Position Regarding Wastes

As the agency with the expertise to fulfill the mission of administering CERCLA's regulatory program, the EPA's interpretations of the petroleum exclusion are entitled to considerable deference. Moreover, the interpretations are not unreasonable; the interpretations harmonize the petroleum exclusion with the goal of CERCLA in order that the fullest remedial nature of the statute may be realized.

A theme running through two EPA documents is that wastes are distinguished from recyclables. In a Final Rule published April 4, 1985, the EPA states in Section 1, "Hazardous Substances Subject to This Rule, a. ICRE Substances":

> If a nondesignated ICR substance is spilled and immediately cleaned up for repackaging, reprocessing, recycling, or reuse, it is not a waste and the spill need not be reported.... However, if the substance is not cleaned up, or is cleaned up for eventual disposal, it is then a waste (and thus a hazardous substance) which has been released to the environment and must be reported if it exceeds the RQ. * * *
>
> ... today's final rule has been clarified to show the distinction between substances that are wastes prior to their initial release and substances that become wastes after their initial release.

(See Exhibit C to Starrs Affidavit.) Later on in the same document, under section "c. Petroleum Exclusion," the EPA states:

> However, EPA does not consider materials such as waste oil to which listed

CERCLA substances have been added to be within the petroleum exclusion.

Similarly, on page 2 of the attachment to the McLaughlin memorandum, referring to wastes from the interior of tanks, the EPA stated that if the product was recovered, it was not a hazardous waste.

GATX's tank bottom material was certainly "waste" as it was being hauled away for disposal, not for reuse. For whatever reason Congress may have elected to treat "petroleum" releases differently under CERCLA, conceptually there is a difference between releases of petroleum, products from tanker spills or from leaking storage tanks and the delivery of petroleum related waste material to a disposal or treatment facility. The former releases have unique characteristics, while in the latter case, the wastes are just one more waste product delivered to a facility where other such wastes accumulated from deliveries by others.

### 2. Contamination

The next questions are whether and what contamination is present in the tank bottom sludge.

The EPA's view of the "various waste streams" from tank interiors is that the material, including "unrecovered product, water, sludge, scale, etc., are presumed to be hazardous," testing being the only method to remove the presumption. (See McLaughlin memorandum and attachment, Exhibit C to Supp. Starrs Affidavit.) Most likely contaminants are benzene and lead. *Id.*

In an earlier memorandum, the EPA had addressed the issue of the scope of the petroleum exclusion. (See July 31, 1987 memo attached as Exhibit E to Starrs Affidavit.) The EPA determined that

> two critical issues in assessing whether a substance is subject to CERCLA is whether or not, and to what extent, a substance is "petroleum."

The EPA then addressed the question of to what extent a substance was petroleum. It asked not whether used oil was "petrole-

um" and thus exempt from CERCLA jurisdiction, but

to what extent substances found in used oil which are not found in crude oil or refined petroleum fractions are also "petroleum." If such substances are not "petroleum" then a release of used oil containing such substances may trigger CERCLA response actions, not to the release of used oil, but to the contaminants present in the oil.

The EPA concluded that contaminants present in used oil or any other petroleum substance are not within the petroleum exclusion. *Id.* at 1. "Contaminants" are substances not normally found in refined petroleum fractions or present at levels which exceed those normally found in such fractions. *Id.* Thus, the EPA concluded:

... hazardous substances which are added to petroleum or which increase in concentration solely as a result of contamination of the petroleum during use are *not* part of the "petroleum" and thus are not excluded from CERCLA under the exclusion.

*Id.* at 5.

It is undisputed that GATX's tank bottom material contains substances not added at the refinery as part of the process of fractional distillation of petroleum. The acknowledged rust from the tanks present in the tank bottom material occurred during the use of the petroleum product, that is, during its storage.

Boeing submitted evidence that the rust-like scale of corrosion products in GATX's sludge contained occluded carbon from the steel storage tank walls, that absorbed compounds of lead and PAHs, listed as hazardous substances under CERCLA. Additionally, Boeing presented evidence that in its expert's professional opinion "within a reasonable degree of scientific certainty", "the scale that forms within petroleum storage tanks is composed in part of the oxides of chromium and nickel," the "most common additives in steel." (Meyer Affidavit at 6.)

GATX did not rebut any of this evidence. While GATX did attempt to rebut the evidence that their steel tanks likely contained chromium or nickel, even eliminating the consideration of the tank's steel containing these metals, there remains the unrebutted evidence of the carbon absorbed lead and PAHs in the sludge from the tank scale. These elements are hazardous substances under CERCLA. The concentrations in the sludge exceed that normally found in refined petroleum products. The rinse water, being a mixture of water and sludge, would contain small concentrations of the hazardous compounds in the sludge. Since CERCLA does not impose any quantitative requirement on the term "hazardous substance" *United States v. Western Processing Co.*, 734 F.Supp. 930, 936 (W.D.Wash. 1990), the rinse water itself should be considered a hazardous substance.

### 3. Fraction of Petroleum

GATX's argument that the sludge and wash water are fractions of petroleum, one more dilute than the other, is a weak argument. Boeing demonstrated that "fraction" is a term of art for the products separated or refined from crude oil or petroleum. "Tarry or waxy residues" are listed as petroleum fractions. GATX's sludge cannot fall into this category, because the sludge is not a product of the fractional distillation process, but a result of contaminated scale from the tanks mixing with the unrecovered petroleum product stored in the tank. While it may be a natural process occurring in any steel storage tank, GATX still possessed this contaminated sludge and had to dispose of it.

The argument on the issue of whether GATX's sludge is a fraction of petroleum is an issue of semantics and is not dispositive. Boeing's unrebutted showing of the hazardous contamination in the tank bottom sludge is the determining evidence.

### 4. Motion to Strike or File Supplemental Pleading

While the argument that Boeing improperly filed affidavits is without merit, for the sake of fully elucidated arguments, the Court will consider GATX's supplemental memorandum. This supplement emphasizes the meaning of the term "petroleum

fraction", the opinions of GATX's experts on the composition of its storage tanks, and the inapplicability of the McLaughlin memorandum.

**First,** *Hawley's Condensed Chemical Dictionary* definition of "fraction." Since "tarry and waxy residues" are included in the definition, GATX insists that petroleum sludge is a petroleum fraction.

Boeing repeats that by GATX's own admission, the sludge is a mixture of corrosion products (primarily rust), and solids that settle in the bottom of the tank; or as its own employee stated, sand, grit, and rust.

The sludge from GATX's tanks is not a product of petroleum distillation. It is a waste product, albeit associated with a petroleum fraction.

**Second,** GATX argues that Exhibit B to the Starrs affidavit, consisting of a portion of the CRC Handbook of Chemistry and Physics, is irrelevant as to the composition of GATX's storage tanks because its experts have testified regarding the composition of GATX's tanks. Donald Miller, manager of GATX storage terminal facility, said the tanks were made of carbon steel; and Dr. Richard Poulson, testified that carbon steel consisted of carbon, iron, and sometimes manganese; he also said that stainless or heat-resisting steel tanks were unnecessary for petroleum storage tanks.

Additionally, GATX argues that it did rebut the evidence that its sludge contained increased concentrations of PAHs and lead. Dr. Poulson stated that because "[t]he metals flaking off the tank's inner walls are wet, granular, and inactive[,] [t]hey will adsorb almost nothing from the petroleum and will not increase the lead or PAH concentrations in either the petroleum or the petroleum sludge."

Boeing again points out that GATX's expert, Dr. Poulson, never examined GATX's tanks, and he did not say that carbon steel never contains chromium and nickel. As to the PAHs, Boeing's expert testified that the metals flaking off the tanks' inner walls are the main constituent of the petroleum sludge and that the metal flakes contain lead and PAHs. Thus, when the metal flakes collect in the bottom of the tank, the concentration of lead and PAHs increases.

A careful reading of the affidavits submitted by both parties reveals that Boeing's analysis is correct. GATX, although being in the best position to prove the composition of their steel tanks, has not done so. Poulson merely testifies to the composition of 50 steel tanks he has personally examined (by what means we do not know), none of them GATX tanks. He testifies as to the standards for storage tanks, but says nothing with respect to GATX's tanks and these standards.

Even disregarding the composition of the storage tanks, there is still the unrebutted conclusion of Dr. Meyer, formed with a "reasonable degree of scientific certainty," that the carbon in the scale at issue contained adsorbed compounds of lead and polynuclear aromatic hydrocarbons (PAHs). (¶ 13 Meyer affidavit.) It is uncontested that there is carbon in the composition of the GATX tanks. It is uncontested that the scale that forms in the tank contains some occluded carbon from the steel. PAHs exist naturally in petroleum. PAHs from the petroleum products naturally must have adsorbed to the carbon in the scale. Lead and PAHs are present in leaded gasoline (¶ 13 Meyer affidavit); PAHs are present in diesel oil (¶ 18); it is not clear that PAHs are present in unleaded gasoline, because Meyer does not refer to them in the paragraph dealing with unleaded gasoline (¶ 19), but he states elsewhere that PAHs exist naturally in petroleum (note 4, p. 6, Meyer affidavit.) One may reason that this being so, fractions of petroleum contain PAHs, and since leaded gasoline contains PAHs, unleaded gasoline must contain PAHs also.

Moreover, of the 79 drums of sludge GATX had shipped to Western Processing, most—67 drums—came from leaded gasoline tanks. (GATX supplemental answers at 3–4.) The rest—12 drums—came from a diesel oil tank, and some unspecified fraction came from an unleaded gasoline tank. *Id.* Thus, the unleaded tank sludge was

apparently mixed with the other sludge, and the possible ambiguity concerning PAHs in unleaded gasoline is without significance.

Regardless of the precise composition of the steel tanks, the corrosion process rendered a contaminated sludge, a waste product containing PAHs and, in some cases, lead.

**Third,** GATX argues that the McLaughlin memorandum addresses the toxicity characteristics of waste from underground storage tanks, but did not discuss whether petroleum sludge from an above-ground storage tank is a CERCLA hazardous waste. Moreover, argues GATX, the memorandum was concerned with lead and benzene from the petroleum itself, not with any potential contaminants petroleum may pick up from the tank in which it is stored. Furthermore, Boeing's cite to 40 C.F.R. § 261.32 (KO52) classifies only tank bottoms from the "petroleum refinery industry" as hazardous waste. Such tank bottoms are hazardous because the tanks are made to resist heat and corrosion during the refining process and are therefore made of steel containing hazardous metals such as chromium or nickel.

Boeing did not specifically address this argument in its response, but has essentially addressed these arguments previously. The CFR reference is a restatement of the assertion that steel tanks with chromium or nickel are used only in refinery storage tanks. This argument has already been sufficiently addressed. The attachment to the McLaughlin memorandum begins with a statement that, "Determination of the hazardous characteristic and quantity of the waste are the key activities to the evaluation," and goes on to discuss the responsibilities of small and large quantity generators. There is no issue related to quantity here, but the parties have certainly been addressing the toxicity problem. The toxicity of the sludge being key, there is no rational basis for distinguishing underground from above-ground tanks. While underground tanks may have the additional problem of corrosion from outside, the focus of the memorandum is, nevertheless, on the toxicity of the sludge, and that has been the focus of the analysis in this case. It is the attachment to the McLaughlin memorandum that stated the presumption that the tank wastes were hazardous and that the only way to remove the presumption was by testing the waste. The information provided with the McLaughlin memorandum was of assistance in construing the meaning of the petroleum exclusion.

## CONCLUSION

Now, therefore, for the reasons discussed above, and for the reasons advanced by Boeing, the GATX tank bottom waste sludge is not excluded from CERCLA coverage. The Court concludes from this record that the 79 drums of tank bottom sludge generated by GATX is a waste material contaminated with PAHs and, additionally, in some instances, with lead, and is not a "fraction of petroleum" exempted from coverage under CERCLA. Having concluded that the GATX tank bottom sludge is not exempted by the petroleum exclusion, the Court also concludes that GATX is a liable party under Section 107(a)(3) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (42 U.S.C. § 9607(a)(3)).

Consequently, GATX's Motion to Strike is DENIED, Motion to File Supplemental Pleading is GRANTED, and Motion for Summary Judgment is DENIED. Boeing's Motion for Partial Summary Judgment against GATX is GRANTED.