The **CITY OF NEW YORK, Plaintiff,**

v.

**EXXON CORPORATION, et al., Defendants.**

**No. 85 CIV 1939.**

United States District Court, S.D. New York.

June 19, 1991.

---

178

Victor A. Kovner, Corp. Counsel, Environmental Prosecution Unit, of the City of New York, New York City (Christopher A. Amato and Peter H. Lehner, of counsel), for plaintiff City of New York.

Lawrence A. Salibra, II, Sr. Counsel, Cleveland, Ohio and Joseph DiBenedetto, Winston & Strawn, New York City, for defendant Alcan Aluminum Corp.

## OPINION AND ORDER

CONBOY, District Judge:

On August 6, 1990, this Court issued an opinion and order ("Opinion"), reported at 744 F.Supp. 474, familiarity with which is presumed, granting in part the motion of the City of New York ("the City") for partial summary judgment against defendant Alcan Aluminum Corporation ("Alcan"). The Court determined that Alcan's waste was disposed of at the City's landfills; that "listed hazardous substances" need not be present in any particular concentration to be considered hazardous under the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendment and Reauthorization Act of 1986 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* (West 1983 & Supp.1991); and that Alcan's waste does not qualify for the "petroleum exclusion" of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14). 744 F.Supp. at 490.

The Court reserved decision on the remaining issues presented by the parties' cross-motions for summary judgment and requested further briefing on the question of whether, under 40 C.F.R. § 302.4(b), Alcan's waste is an "unlisted hazardous waste" that exhibits Extraction Procedure ("EP") toxicity for chromium, cadmium, and lead. *Id.* The parties have submitted

the requested briefs, and the United States, on behalf of the Environmental Protection Agency ("EPA"), has submitted a brief as *amicus curiae* on this question.

In addition, Alcan has moved, pursuant to Fed.R.Civ.P. 60(b) and Local Rule 3(j), for reconsideration of the issues resolved in the Court's Opinion. Alcan argues (1) that the Court erroneously concluded that Alcan's waste is not covered by the petroleum exclusion, (2) that factual issues remain on the question of whether Alcan's waste was deposited in the City landfills, and (3) that the Court did not consider the question of causation, i.e., whether or not Alcan's waste caused the incurrence of response costs at the City landfills. The City opposes the motion and moves for sanctions pursuant to Fed.R.Civ.P. 11.

## I. Interpretation of 40 C.F.R. § 302.4

### A. *Our Prior Opinion*

The issue left unresolved by our prior Opinion concerned one of Alcan's arguments, based on its interpretation of EPA's regulations, 40 C.F.R. § 302.4 ("the Rule"), in support of its contention that not all forms or compounds of lead, chromium and cadmium are considered to be hazardous substances under CERCLA. Alcan asserted that, because Section 302.4(b) of the Rule contains specific provisions for determining whether a waste is a CERCLA hazardous substance due to its chromium, lead or cadmium content, not all compounds containing these elements can be hazardous substances. Section 302.4(b) provides:

> *Unlisted hazardous substances.* A solid waste, as defined in 40 C.F.R. 261.2, which is not excluded from regulation as a hazardous waste under 40 C.F.R. 261.-4(b), is a hazardous substance under section 101(14) of the Act if it exhibits any of the characteristics identified in 40 C.F.R. 261.20 through 261.24.

40 C.F.R. § 302.4(b). Alcan contended that, because neither its waste oil emulsion nor the specific compounds in it are listed in Table 302.4, the Court should apply Section 302.4(b) to determine whether or not Alcan's waste is hazardous.

Our preliminary analysis of Section 302.-4(b) led us to agree. 744 F.Supp. at 487–88. We reasoned as follows: Applying Section 302.4(b) leads to a consideration of whether a waste exhibits EP toxicity for, among other metals, cadmium, chromium, and lead. This reference to, for example, EP toxicity for chromium, in the EPA's provision for "unlisted hazardous substances" in Section 302.4(b) appeared inconsistent with the City's position, that the generic category "chromium and compounds" in Table 302.4 includes all chromium compounds, so that all chromium compounds are "listed hazardous substances" under Section 302.4(a). If "chromium and compounds" included all chromium compounds, it would never be necessary to apply Section 302.4(b) to determine whether or not a waste is EP toxic for chromium. In other words, we suggested, the reference in Section 302.4(b) to 40 C.F.R. § 261.24 would be meaningless for any chromium-containing waste, as well as for lead- and cadmium-containing wastes. Thus, we thought it reasonable to infer that not all chromium, lead, and cadmium compounds are "listed hazardous substances" under Section 302.4(a), and that the categories "chromium and compounds", "cadmium and compounds", and "lead and compounds" are simply generic headings for groupings of metal compounds included for the convenience of the reader.

### B. *CERCLA's Inclusion of the Clean Water Act's List of Hazardous Substances*

■ Based upon the supplemental briefs submitted by the parties and the EPA, the Court is now satisfied that the metals in Alcan's waste are "listed hazardous substances" under 40 C.F.R. § 302.4(a) because they fall within the generic categories listed in Table 302.4 of "cadmium and compounds", "chromium and compounds", and "lead and compounds". These generic categories are not mere headings inserted by the drafters of Table 302.4, but are a substantive listing of hazardous substances, identical to the listing in 40 C.F.R. § 401.15, the list of toxic pollutants designated by the EPA pursuant to Section

307(a)(1) of the Clean Water Act ("CWA"), 33 U.S.C. § 1317(a)(1). Section 101(14) of CERCLA, 42 U.S.C. § 9601(14)(D), specifically defines hazardous substances to include "any toxic pollutant *listed* under section 1317(a) of Title 33". Any compound of cadmium, chromium and lead—a toxic pollutant under the Clean Water Act—is therefore a hazardous substance under CERCLA.

A close examination of Table 302.4 confirms that the generic categories are not simply headings. First, as we concluded in our prior Opinion, 744 F.Supp. at 486, the fact that the generic headings have no Chemical Abstract Service Registry Numbers ("CASRN's") assigned to them is of no significance. Second, where the table includes a group of related substances, such as benzene, benzyl chloride, and benzene sulfonic acid chloride, the table does not uniformly include organizational generic headings, such as "benzene and compounds". *See* 40 C.F.R. Table 302.4. Third, some metals and metal compounds are listed prior to the general heading for that metal. For example, cadmium and cadmium acetate are listed in the table before "cadmium and compounds", chromium is listed before "chromium and compounds", and lead and lead acetate are listed before "lead and compounds". *Id.* Thus, rather than being mere organizational tools, the generic categories represent broad classes of hazardous substances derived from the list of toxic pollutants promulgated pursuant to Section 307(a) of the CWA, which are included, in alphabetical order, along with all the other hazardous substances listed in the table.

### C. *EPA's Own Interpretation of the Rule*

The EPA's own interpretation of the 40 C.F.R. § 302.4, as set forth in its preamble to the Rule in the Federal Register at the time the Rule was promulgated, further supports the conclusion that CERCLA imposes liability for the cleanup of releases of hazardous substances that are within any of the generic categories promulgated under the statutes identified in Section 101(14) and incorporated in 40 C.F.R.

§ 302.4. *See* 50 Fed.Reg. 13456 *et seq.* (April 5, 1985). The preamble explains that Section 102(a) of CERCLA authorizes EPA to adjust reportable quantities ("RQ's") for hazardous substances and that the Final Rule adjusts many of the RQ's established in Section 102(a). 50 Fed.Reg. 13456.

The preamble also describes the reason that the generic categories were not given RQ's:

EPA decided not to establish RQs for the many broad generic classes of organic and metallic compounds designated as toxic pollutants under section 307(a) of the Clean Water Act, *such as* "chlorinated phenols," "phthalate esters," "polynuclear aromatic hydrocarbons," and *"zinc and compounds"*. . . . It was recognized that to establish a single RQ for broad classes of hazardous substances would be inappropriate for many of the compounds within each class. Many of the generic classes of compounds encompass hundreds or even thousands of specific compounds. It would be virtually impossible for the Agency to develop a reportable quantity for a generic class of compounds that would take into account the varying characteristics of all of the specific compounds in that class.

*Id.* at 13461 (emphasis added). Nevertheless, the preamble continues, substances that are within the generic categories of compounds, but not specifically listed for RQ purposes, are "listed" as CERCLA hazardous substances pursuant to Section 302.4(a):

EPA has determined that the notification requirements need apply only to those specific compounds for which RQs are listed in Table 302.4, rather than to the generic classes of compounds. However, as the Agency indicated in the NPRM preamble, this does not preclude liability with respect to releases of specific compounds which are within one of these generic listings but which are not listed in Table 302.4. In other words, *a releaser is liable for the cleanup of releases of hazardous substances which fall under any of the broad, generic*

*classes,* but does not have to report such releases when the specific compounds, and hence the RQs are not listed in Table 302.4.

*Id.* (emphasis added). EPA reiterated this explanation in a subsequent portion of the preamble:

The generic groups of chemicals designated under [CWA] section 307(A), such as "SILVER AND COMPOUNDS," are printed in capital letters and have no RQ [reportable quantity] assigned to them. These generic groups of chemicals could potentially encompass hundreds of specific compounds with varying toxicities; it is therefore not appropriate to establish a single RQ for each generic group. Although CERCLA notification requirements apply only to specific compounds for which RQ's are listed in Table 302.4, *CERCLA liability may* [1] *still attach to releases of specific compounds that are within one of the generic listings but not specifically listed in Table 302.4.*

50 Fed.Reg. 13472–73 (emphasis added). Consequently, according to the EPA, substances that fall within the generic classes listed pursuant to Section 302.4(a) are hazardous substances under Section 101(14) of CERCLA.

■ Where the EPA's interpretation of a statute is reasonable and consistent with the language of a statute, it is entitled to considerable deference. *E.g., Chemical Mfrs. Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) (EPA's interpretation of Clean Water Act is entitled to "considerable deference"); *Chevron, USA, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (court may not substitute its own construction for a reasonable agency interpretation); *Wilshire Westwood Assocs. v. Atlantic Richfield,* 881 F.2d 801, 808–10 (9th Cir.1989) (considerable weight should be accorded to EPA's interpretation of CERCLA); *Ver-*

*mont v. Thomas,* 850 F.2d 99, 102 (2d Cir.1988) (a court must give great deference to EPA's interpretation of Clean Air Act). Moreover, when the EPA Administrator's interpretation of his own regulations is at issue, deference is even more clearly in order. *E.g., Vermont v. Thomas,* 850 F.2d at 102; *Soler v. G & U, Inc.,* 833 F.2d 1104, 1108 (2d Cir.1987), *cert. denied,* 488 U.S. 832, 109 S.Ct. 88, 102 L.Ed.2d 64 (1988).

Thus, where, as here, EPA is interpreting its own regulations, as it has done in the preamble of Section 302.4, EPA's interpretation is entitled to considerable deference. EPA expressly states in the preamble to the Rule that any substance that falls within any of the broad generic classes is a hazardous substance under Section 101(14) of CERCLA. EPA's interpretation is reasonable and consistent with the plain words of Section 101(14), and therefore is entitled to deference.

## D. *RCRA's Two–Prong Approach*

The fact that the reference in Section 302.4(b) to Table 1 and 40 C.F.R. § 261.24 is redundant for any chromium-containing waste, as it is for lead- and cadmium-containing wastes, is, as the City points out, simply the result of overlap between the various statutes which form the basis of CERCLA's definition of hazardous substance. Section 302.4, the list of hazardous substances designated pursuant to CERCLA, 42 U.S.C. § 9602, incorporates designations of hazardous substances pursuant to CWA, RCRA, the Clean Air Act, and the Toxic Substances Control Act. 42 U.S.C. § 9601(14). Whereas the generic categories listed in Table 302.4 of "cadmium and compounds", "chromium and compounds", and "lead and compounds" are taken from the list of toxic pollutants designated pursuant to CWA (*see* 42 U.S.C. § 9601(14)(D)), Section 302.4(b) is derived directly from Subpart C of the EPA regulations promul-

---

**1.** Alcan attaches great significance to the use of the word "may", rather than "shall", arguing that "may" reflects EPA's purported intention that specific unlisted compounds within the generic categories be considered only if they quali-

fy under Section 302.4(b). We disagree. The use of the word "may" simply reflects EPA's recognition that CERCLA liability attaches only if all elements of a CERCLA cause of action are established.

gated pursuant to Section 3001 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* (*see* 42 U.S.C. § 9601(14)((C)). Although the designations or listings of toxic pollutants and hazardous wastes pursuant to the CWA and RCRA are not identical, the coverage of the two regulatory schemes does coincide to some extent. Thus, incorporating the two schemes into 40 C.F.R. § 302.4 inevitably results in some overlap.

█ The RCRA regulations create two separate and independent standards for determining whether a substance is a hazardous waste. Subpart C of the RCRA regulations provides that a waste is hazardous if it exhibits any of the characteristics of ignitability, corrosivity, reactivity, or EP toxicity. *See* 40 C.F.R. §§ 261.20–261.24. Subpart D, on the other hand, is a list of both specific wastes (e.g., endrin, nickel cyanide, DDT, mercury) and general waste categories (e.g., wastewater treatment sludges, filter solids) which are considered RCRA hazardous wastes. *See* 40 C.F.R. §§ 261.30–261.33. Thus a waste which falls within none of the listed specific or generic hazardous waste categories in Subpart D will nevertheless be regulated as an unlisted hazardous substance if it exhibits any of the four characteristics set forth in Subpart C.

As indicated by the definition of hazardous waste set forth in the regulation, the Subpart C characteristics are intended to broaden the category of wastes regulated, not to be an additional or modifying standard to be met by wastes listed in Subpart D:

(a) A solid waste, as defined in § 261.2, is a hazardous waste if:

(2) It meets any of the following criteria:

(i) It exhibits any of the characteristics of hazardous waste identified in Subpart C.

(ii) It is listed in Subpart D. . . .

40 C.F.R. § 261.3(a) (emphasis added). The use of the word "any" in the definition makes clear that a waste will be regulated as a hazardous waste under RCRA if it either is listed in Subpart D *or* exhibits any of the Subpart C characteristics.

There is no requirement that a waste qualify under both Subpart C and Subpart D. For example, Subpart D includes among its generic categories of hazardous waste "surface impoundment solids contained in and dredged from surface impoundments at primary lead smelting facilities," "API separator sludge from the petroleum refining industry" and "tank bottoms (leaded) from the petroleum refining industry." *See* 40 C.F.R. § 261.32. All three of these generic categories of waste contain lead, yet they are regulated as hazardous wastes even if the amount of lead is below the EP toxicity limit for lead in Subpart C. *See* 40 C.F.R. § 261.24.

█ Similarly, there is no requirement that a hazardous waste listed in Table 302.-4(a) exhibit any of the characteristics, identified in 40 C.F.R. 261.20 through 261.24, of corrosivity, ignitability, reactivity, or EP toxicity. Under CERCLA's definition of "hazardous substance," hazardous substances include any wastes which fall under any one of the various definitions and listings of hazardous wastes under other statutes, including RCRA and CWA. 42 U.S.C. § 9601(14). Thus, a waste like Alcan's is hazardous if it contains any of the toxic pollutants "listed under section 307(a)" of the CWA, 42 U.S.C. § 9601(14)(D); there is no requirement that it *also* qualify as a hazardous waste under RCRA, 42 U.S.C. § 9601(14)(C). In other words, there is no requirement that Alcan's waste also exhibit a certain level of EP toxicity or any of the other characteristics derived from Subpart C of RCRA and incorporated into Section 302.4(b). Because the constituents of Alcan's waste are "listed hazardous substances" under 40 C.F.R. § 302.4(a), it is not necessary to consider Section 302.4(b) and its provisions for determining whether an unlisted hazardous waste is hazardous.

█ Alcan's suggestion that only soluble metals, i.e., those that exhibit EP toxicity, should be hazardous substances is therefore without support in the statute or the regulations. Congress determined that the

definition of hazardous substance in Section 101(14), 42 U.S.C. § 9601(14), would be broad, and nowhere required EPA to limit the definition of CERCLA hazardous substance for metals and their compounds to RCRA characteristic wastes. Indeed, insoluble waste may combine with other materials at a site to become a health hazard. Moreover, the solubility test is designed to determine the mobility of particular constituents in waste and their potential to contaminate groundwater after leaking from a landfill. *See* 55 Fed.Reg. 11798, 11800 (March 28, 1990) ("The Extraction Procedure Toxicity Characteristic (EPTC) defines the toxicity of a waste by measuring the potential for the toxic constituents in the waste ... to leach out and contaminate groundwater at levels of health·or environmental concern."). This particular concern—the protection of groundwater—addressed by the EP test is based upon RCRA's regulatory objectives, not on CERCLA's broad, remedial concern for releases into *any* environmental media. *See* Section 101(8) of CERCLA, 42 U.S.C. § 9601(8) ("The term 'environment' means ... surface watèr, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.").[2] Thus, it is not appropriate to engraft onto the definition of hazardous substance under CERCLA a solubility requirement derived from RCRA, especially because CERCLA was enacted, in large part, to correct the "[d]eficiencies in [RCRA]" which had "left important regulatory gaps." H.R.Rep. No. 1016, Part I, 96th Cong., 2d Sess. 22, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6125.

### E. *1990 Clean Air Act Amendments*

Our conclusion that Congress designated all cadmium, chromium and lead compounds as CERCLA hazardous substances is bolstered by the 1990 amendments to the Clean Air Act, which establish, *inter alia*, a list of "hazardous air pollutants" for which EPA must establish emission standards. Among the listed hazardous air pollutants are "cadmium compounds", "chromium compounds" and "lead compounds". *See* Section 112(b)(1) of the Clean Air Act, 42 U.S.C.A. § 7412(b)(1) (West 1983 and Supp.1991). The following note appears at the bottom of the list: "For all listings above which contain the word "compounds" ... the following applies: Unless otherwise specified, these listings are defined as including any unique chemical substance that contains the named chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure." *Id.* By virtue of their listing as hazardous air pollutants under Section 112 of the Clean Air Act, all cadmium, chromium and lead compounds are also hazardous substances under CERCLA. *See* 42 U.S.C. § 9601(14)(E) ("any hazardous pollutant" listed under section 112 of the Clean Air Act). Consequently, the presence of cadmium, chromium, and lead compounds in Alcan's waste oil emulsion renders that waste a hazardous substance under CERCLA § 101(14)(E).

We conclude that Alcan's waste, because it contains cadmium, chromium, and lead compounds, qualifies as a hazardous substance pursuant to Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

### II. Petroleum Exclusion

Alcan asks the Court to reconsider its conclusion, 744 F.Supp. at 489–90, that Alcan's waste oil emulsion is not subject to CERCLA's "petroleum exclusion". Alcan argues that its waste oil contains concentrations of lead, chromium, and cadmium far below those found in "virgin oil". Therefore, Alcan contends, its waste oil

---

**2.** Both the EPA and the City point out that EPA has now promulgated regulations which, *inter alia,* replace the EP toxicity test with a new procedure, the Toxicity Characteristic Leaching Procedure ("TCLP"). *See* 55 Fed.Reg. 11798 *et seq.* (March 29, 1990). In its discussions of the new regulations, EPA indicated that the TCLP, like the EP toxicity test before it, "focuses on human health risks from ground water contamination" and is not designed to assess other threats to the environment, *e.g.,* possible effects on aquatic organisms. *Id.* at 11808. Moreover, EPA stressed, "the Agency does not believe that a single characteristic is capable of identifying all wastes that present a threat to human health and the environment." *Id.*

falls within the exclusion. We have reconsidered our earlier determination that Alcan's waste is not subject to the petroleum exclusion, and, upon reconsideration, we adhere to our prior conclusion.

■ The petroleum exclusion is part of CERCLA's definition of hazardous substance: "[t]he term [hazardous substance] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under (A) through (F) of this paragraph." 42 U.S.C. § 9601(14). By its plain language, this exclusion for petroleum does not include waste oil. A standard chemical dictionary defines petroleum fractions as usable petroleum products which are derived by 'cracking' or distilling crude oil. *See Hawley's Condensed Chemical Dictionary* 540, 892 (11th ed. 1987) (quoted in *United States v. Western Processing Co.*, 761 F.Supp. 713, 719 (W.D.Wash.1991)). *Hawley's* also states that the most important petroleum fractions, obtained by cracking, include various hydrocarbon gases, naphtha, gasoline, kerosene, fuel oils, gas oil, lubricating oils, paraffin wax, and asphalt. *Id.* at 892 (quoted in *Western Processing*, 761 F.Supp. at 719). Although waste oils such as Alcan's—petroleum fractions to which contaminants have been added during use—are to an extent "[re]usable petroleum products", they are not strictly "petroleum, including crude oil or any fraction thereof". Indeed, the EPA has stated that only *un*adulterated waste oils are excluded from the definition of hazardous substance under Section 101(14). 50 Fed.Reg. 13460 (April 4, 1985).

The EPA has published its interpretation of the petroleum exclusion in the Federal Register and summarized it in an internal memorandum, dated July 31, 1987 and written by the EPA General Counsel, entitled, "Scope of the CERCLA Petroleum Exclusion" ("EPA Memo").[3] According to the notice in the Federal Register,

EPA interprets the petroleum exclusion to apply to materials such as crude oil, petroleum feedstocks, and refined petroleum products, even if a specifically listed or designated hazardous substance is present in such products. However, *EPA does not consider materials such as waste oil to which listed CERCLA substances have been added to be within the petroleum exclusion.*

50 Fed.Reg. 13460 (April 4, 1985) (emphasis added). The EPA Memo expands upon this interpretation of the exclusion for petroleum, defining it to include adulterated used oil wastes to the extent that the amounts of hazardous substances or contaminants found in those wastes do not exceed levels normally found in petroleum or refined petroleum fractions. In other words, " 'petroleum' includes hazardous substances normally found in refined petroleum fractions but does not include either hazardous substances found at levels which exceed those normally found in such fractions or substances not normally found in such fractions." EPA Memo at 2.[4]

Thus, " 'petroleum' under CERCLA also includes hazardous substances which are normally mixed with or added to crude oil or crude oil fractions during the refining process." EPA Memo at 3. However, "hazardous substances which are *added to petroleum or* which *increase in concentration* solely as a result of contamination of the petroleum *during use* are not part of the 'petroleum' and thus are *not exclud-*

---

**3.** Although the EPA Memo, which is attached as Exhibit D to Alcan's memorandum in support of its motion for reconsideration ("Alcan Recons. Mem."), is apparently an internal EPA memorandum rather than part of formal regulations or rule-making, courts have accorded the General Counsel's analysis "considerable deference". *E.g., Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*, 881 F.2d 801, 810 (9th Cir.1989). *See also Mid Valley Bank v. North Valley Bank*, 764 F.Supp. 1377, *4 (E.D.Ca. May 21, 1991) (relying on General Counsel Memorandum, a "central document in examining both the legis-

lative and contemporaneous administrative construction" of the petroleum exclusion); *United States v. Western Processing Co.*, 761 F.Supp. 713, 721–22 (W.D.Wash.1991) (relying on General Counsel Memorandum); *Washington v. Time Oil Co.*, 687 F.Supp. 529, 532 (W.D.Wash.1988) (implicitly applying EPA's interpretation of petroleum exclusion).

**4.** References are to the copy of the EPA Memo attached to Alcan's Recons. Mem. as Exhibit D.

*ed from CERCLA under the exclusion.* In such cases, EPA may respond to releases of the added hazardous substance, but not the oil itself." *Id.* (emphasis added). As EPA concludes,

> an interpretation of 'petroleum' to include only indigenous, refinery-added hazardous substances is the interpretation of [the petroleum exclusion] which is most consistent with Congressional intent. The language of the provision, its explanation in the legislative history, and the Congressional debates on the final Superfund bill clearly indicate that Congress had no intention of shielding from Superfund response and liability hazardous substances merely because they are added, intentionally or by use, to petroleum products.

*Id.*

Consistent with the EPA's interpretation of the petroleum exclusion, several courts have determined that wastes at issue in the actions before them are not subject to the petroleum exclusion because contaminants present in the wastes are not indigenous to petroleum or refined petroleum products, or are present at elevated levels. *See, e.g. Mid Valley Bank v. North Valley Bank,* 764 F.Supp. 1377, *4 (E.D.Ca.1991); *United States v. Western Processing Co.,* 761 F.Supp. 713, 721–22 (W.D.Wash.1991); *Washington v. Time Oil Co.,* 687 F.Supp. 529, 532 (W.D.Wash.1988).

Alcan cannot escape CERCLA liability by relying on the petroleum exclusion. As Alcan itself has admitted, the levels of contaminants in the water/oil emulsion increase during Alcan's industrial process. In a report on the emulsion prepared by Alcan's Supervisor of Laboratories and Environmental Management, Alcan explains that

> The emulsions are prepared using deionized water. Makeup of losses due to evaporation is also accomplished using deionized water. *However, over a period of time, concentrations of some common metals do increase.*

Amato 3/8/89 Aff., Ex. C at 3 (emphasis added). Moreover, the EPA, in responding to Alcan's argument that it should benefit from the petroleum exclusion, emphasized that the "hazardous substances are present in Alcan's waste as contaminants in concentrations higher than that normally found in refined fractions of oil." Amato 3/8/89 Aff., Ex. E (letter, dated December 24, 1986, from Dr. J. Winston Porter, Assistant Administrator for Solid Waste and Emergency Response at EPA, to Lawrence A. Salibra, II). Even though Alcan did not intentionally add contaminants to the oil it used, it cannot benefit from the petroleum exclusion, for "under [the EPA's] interpretation, the source of the contamination, whether intentional addition of hazardous substances to the petroleum or addition of hazardous substances by use of the petroleum, is not relevant to the applicability of the petroleum exclusion." EPA Memo at 2. What is relevant is that the contamination in Alcan's waste oil is not the result of the oil refining process.

■ By comparing the levels of contaminant in its waste with those in "No. 6 fuel oil", Alcan attempts to establish that the concentrations of cadmium, chromium, and lead in its waste oil are not elevated. As Alcan concedes, however, its waste oil does not contain No. 6 fuel oil. Nevertheless, Alcan asserts that

> the Alcan emulsion and No. 6 fuel oil are simply fractions of virgin oil. It is generally known that No. 6 fuel oil, being a lower fraction, will have a composition that most directly resembles actual virgin oil pumped from the ground. Insofar as Alcan has been unable to find direct measures on virgin oil, No. 6 fuel has been used as a reasonable alternative.

Alcan Reply Mem. on Alcan's Mot. for Reconsideration ("Alcan Recons. Reply") at 10. Because Alcan does not use No. 6 fuel oil, No. 6 fuel oil is not a "reasonable alternative", and the comparison between Alcan's waste and No. 6 fuel oil is not instructive or relevant. The only relevant comparison is between the unused petroleum product that Alcan begins with and the used waste oil that it produces. Otherwise, for example, a company whose industrial process produces lead could compare the

level of lead in its waste with leaded gasoline,[5] even though it began with an unleaded petroleum product. That company could thus systematically dispose of its lead waste by adding it to unleaded petroleum, and dumping the mixture, without facing CERCLA liability. Congress, in enacting CERCLA, could not have intended such a result.[6]

As Alcan has admitted, and EPA has determined, the contaminants in the oil Alcan uses *increase* during the industrial process. Because the increased contaminants are not indigenous to the petroleum Alcan uses, or are present at elevated levels, Alcan's waste oil is included in CERCLA's definition of hazardous substance. To the extent that the levels of contaminants in Alcan's waste exceed those found in the refined petroleum product it uses to lubricate its rolls, Alcan is subject to CERCLA liability.

III. Presence of Alcan's Waste in City Landfills

Alcan urges the Court to reconsider its determination that Alcan's waste was deposited in the City landfills, 744 F.Supp. at 481–82, arguing that genuine issues of material fact remain on this issue. Alcan suggests that summary judgment was inappropriate because "Alcan has produced evidence, and therefore, made an initial showing that is emulsion was never deposited in City landfills and could not have caused response costs." Alcan Recons. Mem. at 4. In granting summary judgment to the City on the question of whether Alcan's waste was deposited in the City landfills, however, the Court explicitly determined that the evidence offered by Alcan was not sufficient to create a genuine issue of fact as to the final destination of Alcan's waste. 744 F.Supp. at 482. Although Alcan has submitted additional evidence in support of its assertion that its waste was not trucked to the City landfills, the Court adheres to its prior decision granting summary judgment to the City on this issue.

■ First, Alcan argues that it is not possible that hazardous substances of the type in Alcan's waste are leaching into the groundwater at the City landfills. Alcan asserts that, because the contaminants in Alcan's waste are assertedly insoluble, there is therefore no way that the contaminants leaching into the groundwater at the City landfills are from Alcan's waste. Alcan Recons. Mem. at 20–21. That the contaminants in Alcan's waste are not present in the groundwater does not mean, however, that they are not present in the soil at the City landfills. Alcan also overlooks that oil leachate—approximately 160,000 gallons of waste oil contaminated with PCBs, synthetic organic compounds, and heavy metals including cadmium, chromium, and lead—has been discovered leaching into Jamaica Bay at the Pennsylvania

---

**5.** The Ninth Circuit, applying the EPA's interpretation of the petroleum exclusion, has concluded that leaded gasoline is subject to the exclusion. *Wilshire Westwood Assocs. v. Atlantic Richfield*, 881 F.2d at 810.

**6.** In any event, we observe that the levels of contaminants in Alcan's waste exceed the levels of contaminants in No. 6 fuel oil identified in EPA's proposed rule. *See* 52 Fed.Reg. 16,982, 17,004 (May 6, 1987). For example, the level of lead in Alcan's waste, as we indicated in our prior opinion, 744 F.Supp. at 483, 489, has ranged as high as 14 ppm, averaging 9.2 ppm, under a test performed on Alcan's waste (apparently at Alcan's direction) in 1980. By comparison, the level of lead in No. 6 fuel oil is 3.5 ppm (mean), 10 ppm (worst). 52 Fed.Reg. at 17,004. Although Alcan attacks the 14.2 ppm test result on the ground that Alcan intended the test to analyze EP toxicity, not total lead content, EPA maintains, and Alcan does not dispute, that the test was appropriate and accurate for determining total lead content. Amato 3/8/89 Aff.Ex. E.

With its motion for reconsideration, Alcan submits "new" data, apparently obtained in 1989, indicating that the level of lead in Alcan's waste averaged .94 ppm using a testing procedure known as "Inductively Coupled Plasma Emission Spectroscopy" ("ICP"), the significance of which Alcan does not explain. Alcan Recons. Mem. at 16. Using the same testing procedure, however, the level of chromium in Alcan's waste averaged 1.04 ppm. *Id.* This level of chromium content exceeds that in No. 6 fuel oil (mean, 0.4 ppm; worst, 10 ppm). *See* 52 Fed.Reg. at 17,004. Thus, even if we accepted Alcan's latest attempt to establish that the level of lead in its waste oil is less than No. 6 fuel oil, we would conclude that the level of chromium in Alcan's waste oil exceeded that found in No. 6 fuel oil.

Avenue landfill. Affidavit of Philip J. Gleason, sworn to on March 9, 1989 ("Gleason Aff."), ¶ 7 & Ex.D. Alcan does not dispute that the oil leachate contains contaminants of the sort disposed of by Alcan.

Second, Alcan submits the affidavit of Harry Sutton, formerly a truck driver and dispatcher based at Mahler's Syracuse Refinery Terminal in Syracuse, New York, who asserts that "all trucks were dispatched to Alcan from the Mahler companies' Syracuse terminal" and that "all trucks returned to Syracuse for refining of the waste oil emulsion." Affidavit of Harry Sutton, dated March 10, 1989 ("Sutton Aff."), ¶¶ 8–9. Sutton further avers that "at no time was any Alcan waste transported to the Edgewater, New Jersey disposal facility." *Id.* ¶ 10. Alcan asserts that this affidavit contradicts the affidavit of Kenneth Mansfield, upon which the Court relied in determining that Alcan's waste was disposed of in the City landfills.[7]

■■■ We observe at the outset that Alcan does not explain why it did not submit Sutton's affidavit, which was prepared in March 1989, with its original summary judgment papers, submitted in August 1989. Sutton's affidavit is by no means "new evidence" that was unavailable to Alcan when it responded to the City's motion for summary judgment. This ground for reconsideration is therefore inappropriate and we decline to reconsider our prior ruling based on this evidence.

Even if we were to do so, the Sutton affidavit does not contradict Mansfield's assertion that Alcan's waste was trucked to the City landfills. Consistent with Sutton's affidavit, Mansfield avers that loads of Alcan waste were at times routed through the Syracuse facility before reaching the Review Avenue or Edgewater facilities. Mansfield 2/11/89 Aff. at 7 n. 3. In addition, Sutton asserts only that no Alcan waste was transported to the Edgewater facility, Sutton Aff. ¶ 10; he does not deny that Alcan waste was transported from the

Syracuse facility to the Review Avenue facility. Finally, as the dispatcher at the Syracuse facility, Sutton presumably has only direct knowledge of dispatches from the Syracuse facility; his affidavit in no way indicates that he is competent to testify as to the Edgewater facility, where Mansfield served as dispatcher.

Third, Alcan submits another affidavit by Kenneth Mansfield, which was prepared in connection with an action concerning the dumping of hazardous wastes into a borehole or tunnel ("the Butler Tunnel") in Pittston, Pennsylvania.[8] Alcan argues that Mansfield states in one affidavit that Alcan's waste went to the City landfills and in another affidavit that it went to the Butler Tunnel. Alcan Recons. Mem. at 22. No such inconsistency exists, however. In neither affidavit does Mansfield say that *all* of Alcan's waste went to one site or another; indeed, in the Butler Tunnel affidavit, Mansfield states: "The Mahler companies disposed of some of Alcan's liquid oily wastes at the Borehole, some at five New York City landfills and some at other locations." Mansfield 10/4/90 Aff., ¶ 36. Thus, the purported inconsistency is explicitly refuted by the affidavits themselves.

Finally, Alcan asks the Court to reinterpret a letter sent from Mahler to Alcan in 1979 which the Court found was not, as Alcan contended, evidence that Alcan's waste was not sent to the landfills. 744 F.Supp. at 478. Alcan argues that "if the Mahler letter is correct, then the BS & W values, as a result of the processing, would have been lower prior to arrival at Edgewater and disposal would not be appropriate." Alcan Recons. Mem. at 22. However, the letter states that Alcan's waste was processed into separate constituents, without indicating where those constituent parts were sent. While it seems logical that, as Alcan suggests in its reply brief, Mahler would not dispose of reusable oil recovered from Alcan's waste, Mahler obviously would dispose of the remaining waste

---

7. Mansfield's initial affidavit, dated February 11, 1989 ("Mansfield 2/11/89 Aff."), is attached to the City's initial notice of motion for summary judgment, filed in February 1989.

8. Mansfield's second affidavit, dated October 4, 1990 ("Mansfield 10/4/90 Aff."), is attached as Ex. F to Alcan's Recons. Mem.

products. Mahler's letter simply does not contradict the City's undisputed evidence that Alcan's waste was disposed of in the City landfills.

Because there are no genuine issues of material fact as to whether Alcan's waste was disposed of in the City landfills, the City is, as we determined in our prior Opinion, entitled to summary judgment on this issue.

## IV. Causation

Alcan moves for reconsideration on the ground that the Court did not consider the issue of causation in deciding that liability under CERCLA attaches regardless of the concentration of the hazardous substances present in the defendant's waste, as long as the defendant's waste and/or the contaminants in it are "listed hazardous substances" pursuant to 40 C.F.R. § 302.4(a). 744 F.Supp. at 483.[9] Although Alcan concedes that its waste oil emulsion was contaminated with cadmium, chromium, and lead, it alleges that the levels of those substances were below "ambient levels", and that "[w]hen the alleged hazardous material is equal to or below ambient levels and below government recognized limits for hazard, a causal nexus can never be shown." Alcan Recons. Mem. at 13. Thus, Alcan argues, "[e]ven if the City can prove that Alcan's emulsion is a hazardous substance ... it cannot prove that the emulsion caused or contributed to response costs." *Id.*

## A. *CERCLA's Liability Scheme*

As we indicated in our prior Opinion, to hold a party liable as a generator of hazardous wastes under Section 107(a) of CERCLA,[10] a plaintiff must establish that the defendant has

(1) disposed of its hazardous substances (2) at a facility which now contains hazardous substances of the sort disposed of by the generator (3) if there is a release of that or some other type of hazardous substance (4) which causes the incurrence of response costs.

744 F.Supp. at 480 (quoting *United States v. Wade,* 577 F.Supp. 1326, 1333 (E.D.Pa. 1983)). Alcan attempts to import a causation requirement into each of these four elements of CERCLA's liability scheme.

First, Alcan suggests that, because some hazardous substances occur naturally in the environment, waste should not be considered "hazardous" unless contaminants are present in the waste in certain "unnatural" concentrations or forms. Otherwise, Alcan argues, a defendant could be held liable without having "caused" any harm to the environment. We have rejected Alcan's proposed construction of the definition of hazardous substance as being inconsistent with the language of CERCLA's definition of hazardous substance and the regulations incorporated therein and promulgated thereunder. *See* 744 F.Supp. at 483–84; *supra* at 181. Because Alcan's waste oil emulsion contained hazardous material, the emulsion is a hazardous substance under CERCLA. Thus, the first

9. As we have determined, the contaminants in Alcan's waste are "listed hazardous substances". See *supra* at 4.

10. Section 107(a) of CERCLA provides, in relevant part:

(a) covered persons; scope

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous sub-

stances, and ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

42 U.S.C. § 9607(a).

element, "disposed of [a] hazardous substance", is satisfied.

■ As to the second and third elements, Alcan asserts that the City must establish that the hazardous substances now present at the landfills and being released into the environment are Alcan's. Alcan's proposed interpretation is contrary to the statutory language and has been rejected by courts considering it. "Reduced of surplus languages, section 107(a) imposes liability on off-site waste generators who:

> arranged for disposal ... of hazardous substances ... at any facility ... *containing such hazardous substances* ... from which there is a release ... of *a* hazardous substance.

42 U.S.C. § 9607(a)(3) (emphasis supplied)." *United States v. Monsanto,* 858 F.2d 160, 169 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

> As used in the statute, the phrase "such hazardous substances" denotes hazardous substances alike, similar, or of a like kind to those that were present in a generator defendant's waste or that could have been produced by the mixture of defendant's waste with other waste present at the site. It does not mean that the plaintiff must trace the ownership of each generic chemical compound found at a site. Absent proof that a generator defendant's specific waste remained at a facility at the time of release, a showing of chemical similarity between hazardous substances is sufficient.

*Id.* Thus, the second element is satisfied if the plaintiff establishes that hazardous substances chemically similar to those present in a defendant's waste are present at the waste site.

■ The statute also does not require the City to establish that the hazardous substances being released into the environment at the City landfills are traceable directly to Alcan. The statutory language requires only that there be a release of "a" hazardous substance at the site. Thus, the release which results in the incurrence of response costs and liability need only be of "a" hazardous substance and not necessarily the one contained in the defendant's waste. "The only required nexus between the defendant and the site is that the defendant have dumped his waste there and that the hazardous substances found in the defendant's waste are also found at the site." *Wade,* 577 F.Supp. at 1333 (emphasizing distinction between CERCLA's use of "such" to modify "hazardous substance" in paragraph three and the switch to "a" in paragraph four of Section 107(a)). Therefore, the third element of the statute is satisfied regardless of the amount of release and the type of hazardous substance, "(3) if there is a release of ... some ... type of hazardous substance." *Wade,* 577 F.Supp. at 1333; *Louisiana–Pacific v. Asarco,* 735 F.Supp. 358, 361–62 (W.D.Wash. 1990).

Alcan's argument, that the hazardous substances present at the landfills and leaching into the environment must be traced directly to Alcan's waste, is an attempt to force the City to "fingerprint", or prove the ownership of, the wastes found in its landfills. Particularly in CERCLA actions involving multiple polluters, a "fingerprint" requirement would "eviscerate the statute" because plaintiffs will not be able to link contaminants at a waste site to the individual defendants who contributed to the contamination. *E.g., Dedham Water Co. v. Cumberland Farms Dairy,* 889 F.2d 1146, 1153–54 (1st Cir.1989); *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1282 (D.Del. 1987), *aff'd,* 851 F.2d 643 (3d Cir.1988); *Wade,* 577 F.Supp. at 1332.

"The overall structure of CERCLA's liability provisions also militates against [Alcan's] 'proof of ownership' argument." *Monsanto,* 858 F.2d at 169. The statute provides that "[n]otwithstanding any other provision or rule of law", liability under Section 107(a) is "subject *only* to the defenses set forth" in Section 107(b). 42 U.S.C. § 9607(a) (emphasis added). The three defenses set forth in Section 107(b) allow defendants to avoid liability by proving that the release and resulting damages

were "caused solely" by an "act of God" (§ 107(b)(1)), an "act of war" (§ 107(b)(2)), or acts or omissions of a third-party or third-parties (§ 107(b)(3)).[11] Each of these three defenses "carves out from liability an exception based on causation." *New York v. Shore Realty*, 759 F.2d 1032, 1044 (2d Cir.1985). "Congress has, therefore, allocated the burden of disproving causation to the defendant who profited from the generation and inexpensive disposal of hazardous waste." *Monsanto*, 858 F.2d at 170.

In *Shore Realty*, the Second Circuit examined CERCLA's causation requirement in the context of whether an owner of a site can be liable under Section 107(a)(1), which imposes liability on "the owner and operator of a ... facility," 42 U.S.C. § 9607(a)(1), if it neither owned the site at the time of the disposal nor caused the presence or the release of the hazardous waste at the facility. The court rejected the owner's attempt to impose a causation requirement into Section 107(a)(1), finding it "at odds with the structure of the statute." *Shore Realty*, 759 F.2d at 1044.

> Interpreting section 9607(a)(1) as including a causation requirement makes superfluous the affirmative defenses provided in section 9607(b), each of which carves out from liability an exception based on causation. Without a clear congressional command otherwise, we will not construe a statute in any way that makes some of its provision surplusage.

*Id.* (citations omitted).

The Second Circuit drew additional support for its interpretation from the legislative history, which indicates that "Congress specifically rejected including a causation requirement in section 9607(a)." *Id.* An early House version of what ultimately became Section 107(a) limited liability to "any person who caused or contributed to the release or threatened release." *Id.* (quoting H.R.Rep. 7020, 96th Cong., 2d Sess. § 3071(a) (1980), *reprinted in 2 A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 at 438*). As ultimately enacted after House and Senate compromise, however, CERCLA "imposed liability on classes of persons without reference to whether they caused or contributed to the release or threat of release." *Id.* The legislature thus eliminated the element of causation from the plaintiff's liability case. *Id.*

Although the Second Circuit analyzed CERCLA's causation requirement in the context of owner's liability under Section 107(a)(1), its analysis has been extended to generator liability under Section 107(a)(3). For example, in *Monsanto*, the court concluded that the Second Circuit's reasoning in *Shore Realty* "applies equally to the generator defendants' contentions" that a plaintiff under CERCLA must trace the ownership of the wastes present in and being released from a waste site. 858 F.2d at 170. The court assumed that, "[i]n deleting causation language from section 107(a), ... Congress knew of the synergistic and migratory capacities of leaking chemical waste, and the technological infeasibility of tracing improperly disposed waste to its source." *Id.* Moreover, the court observed, "leaking chemicals may combine to form new compounds or escape into the atmosphere before proper response action can be taken." *Id.* n. 19. Thus, the court refused to "engraft[ ] a 'proof of ownership' requirement, which in practice,

---

**11.** Section 107(b) provides, in relevant part:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

would be as onerous as the language Congress saw fit to delete." *Id.* (citing *Wade,* 577 F.Supp. at 1332).

We conclude that, to meet its burden on the second and third elements of liability under CERCLA, the City must establish that hazardous substances like those present in Alcan's waste are present at the landfills and that hazardous substances are being released into the groundwater. Here, the City has met its burden by establishing (1) that Alcan's waste contained cadmium, chromium, and lead compounds; (2) that cadmium, chromium, and lead compounds are present at the City landfills; and (3) that cadmium, chromium and lead compounds are leaching into the groundwater. Alcan does not dispute any of these facts. Thus, the second and third elements have been satisfied.

### B. *Causation of Response Costs*

■ Finally, Alcan argues that a causation requirement is embodied in the fourth element of CERCLA liability, "that the release or threatened release has caused the plaintiff to incur response costs." This element, Alcan suggests, requires the City to establish that the release of hazardous substances *from Alcan's waste* caused the City to incur response costs. We note first that there is an ambiguity in the phrase "from which there is a release, or a threatened release which causes the incurrence of response costs, of hazardous substance," 42 U.S.C. § 9607(a), because the absence of a comma after the words "threatened release" and the use of the words "which causes," as opposed to "that causes," leave it uncertain whether both a release and a threatened release, or only a threatened release, must cause the incurrence of response costs. *Shore Realty,* 759 F.2d at 1044, n. 18. In our view, the better reading of this phrase is that only a threatened release must cause response costs. First, as a matter of grammar, the placement of the words "of hazardous substance" makes no sense unless the clause "which causes the incurrence of response costs" modifies only "a threatened release". Second, as a matter of substance, it is reasonable to assume that, to prevent CERCLA actions

for wholly speculative "threatened releases", Congress specifically limited CERCLA liability to threatened releases which actually cause the incurrence of response costs. For purposes of this motion, however, we resolve the ambiguity in favor of Alcan and assume that a release must cause the incurrence of response costs.

The plain statutory language does not require a CERCLA plaintiff to establish that a particular defendant's waste caused the plaintiff to incur response costs. The statute requires only that there be "a" release of "a" hazardous substance. 42 U.S.C. § 9607(a). It does not require that there be a release of the defendant's waste, or even such hazardous substances as are found in the defendant's waste. Thus, it is sufficient for the City to establish that there was a release of any hazardous substance at its landfills, causing the City to incur response costs. The City has gone one step further, however, in establishing that cadmium, chromium and lead compounds are leaching into the groundwater at the sites. *See* Gleason Aff. ¶¶ 5–9, Exs. C & D. Moreover, it is undisputed that the City has expended more the $2 million responding to the release of toxic wastes at the sites. *Id.* ¶¶ 3–4.

Alcan relies on *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664 (5th Cir.1989), and *Louisiana–Pacific Corp. v. Asarco, Inc.,* 735 F.Supp. 358 (W.D.Wash.1990), in support of its position that the fourth element of CERCLA liability embodies a proximate causation requirement or threshold for liability. Concerned that, "without a quantitative limit CERCLA liability could attach to the release of any substance," *Amoco Oil,* 889 F.2d at 670, including some substances which are essential to humans at low levels but toxic in higher concentrations, *id.* n. 10, these courts read the statute to require that each individual defendant's waste "cause[ ] the incurrence of response costs". In other words, if the defendant's waste does not contain a threshold amount of a hazardous substance—for example, more than the amount promulgated as part of a drinking water standard, a court would conclude

that the defendant's waste does not cause harm to the environment and thus that the waste did not cause the plaintiff to incur response costs cleaning up the environment.

In *Amoco Oil*, for example, the plaintiff sought to impose CERCLA liability on a single defendant for the release of radionuclides. Because "all matter is radioactive to some degree," 889 F.2d at 670, the court reasoned, liability should only attach if the radioactivity attributable to release of radionuclides exceeds some threshold limit at which radioactivity is known to be harmful. *Id.* at 670–71. Although the court recognized that it was "notably entering unexplored territory," *Id.* at 670, the court found this exploration necessary to protect a defendant from being held liable for the release of a hazardous substance that did not cause any harm to the environment. "To justifiably incur response costs, one necessarily must have acted to contain a release threatening the public health or the environment." *Id.* Accordingly, the court held that "a plaintiff who has incurred response costs meets the liability requirement as a matter of law if it is shown that *any* release violates, or any threatened release is likely to violate, *any* applicable state or federal standard, including the most stringent." *Id.* at 671. *See also Asarco*, 735 F.Supp. at 362 (relevant factual inquiry should focus on whether the waste deposited by defendant justified any response actions, i.e., whether the concentration of hazardous substance in the waste exceeded drinking water standards).

If Alcan's waste were the only waste present at the City landfills, the court's reasoning in *Amoco Oil* might merit consideration here. As the *Amoco Oil* court itself recognized, however, the causation inquiry is different in a CERCLA action where, as here, multiple generators (and multiple hazardous substances) are involved. For determining which generator(s) among two or more generators are responsible for the hazard that resulted in

response costs, "the causation requirement has been interpreted in a somewhat relaxed manner due to difficult proof problems inherent in toxic waste cases and CERCLA's broad liability provisions." 889 F.2d at 670 n. 8. Accordingly, "in cases involving multiple sources of contamination, a plaintiff need not prove a specific causal link between costs incurred and an individual generator's waste." *Id.* (citing *Wade*, 577 F.Supp. at 1333–34); *see also United States v. Western Processing Co.*, 734 F.Supp. 930, 936 (W.D.Wash.1990) (plaintiffs need not prove that as to each generator of hazardous waste in a multi-generator case, response costs were incurred).[12] "CERCLA looks to whether [Alcan's waste oil] was in the chemical soup found at [the City landfills] and whether the [City] incurred costs in investigating and/or cleaning up that soup." *Western Processing*, 734 F.Supp. at 936.

 Our refusal to read a causation requirement into the fourth element of liability under CERCLA is consistent with the Second Circuit's reading of Section 107(a). As the Second Circuit has determined, Congress specifically rejected the inclusion of a causation requirement in Section 107(a). *New York v. Shore Realty*, 759 F.2d 1032, 1044 (2d Cir.1985); *see supra* at 192. Instead, the affirmative defenses set forth in Section 107(b) carve out from liability an exception based on causation. *Id.* We conclude that, to establish liability in a multi-generator, multi-hazardous substance case, it is sufficient for a plaintiff to establish that the release of *any* hazardous substance at a waste site caused the plaintiff to incur response costs. By establishing that a release of hazardous substances has occurred at the City landfills, and that the release has caused the City to incur response costs, the City has met its burden on the fourth element of CERCLA liability.

C. *Third–Party Affirmative Defense*

 Although Alcan addresses its causation arguments only in light of the ele-

---

12. Even though the case before it involved numerous contributors to a hazardous waste site, the court in *Asarco* apparently overlooked the Fifth Circuit's distinction between single- and multi-defendant CERCLA actions and read a proximate causation requirement into the fourth element of CERCLA liability.

ments that the City must establish to hold Alcan liable under CERCLA, Alcan's argument that the disposal of *its* waste did not cause the City to incur response costs is more appropriately considered as an attempt to state an affirmative defense pursuant to Section 107(b)(3). *See Shore Realty*, 759 F.2d at 1044. In essence, Alcan is arguing that, because only trace amounts of hazardous substances were present in its waste, "the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by . . . an act or omission of a third party," 42 U.S.C. § 9607(b)(3), that is, that the only released substances that caused the response costs were substances that were generated by third-parties.[13] Notably, Alcan bears the burden, on an affirmative defense, of establishing that the release of hazardous substances were caused *solely* by others. Furthermore, Alcan must establish that it exercised due care with respect to the hazardous substance concerned, and that it took precautions against foreseeable acts or omissions of others. 42 U.S.C. § 9607(b)(3)(a) and (b).

■ Alcan has not met, and cannot meet, its burden in establishing an affirmative defense pursuant to Section 107(b)(3). First, Alcan would have to argue that the third parties solely responsible for the release of a hazardous substances at the City landfills are exclusively other generators. One of the responsible third parties, however, is Russell Mahler and his waste disposal companies, with whom Alcan had a contractual relationship for the disposal of its waste. Thus, Alcan cannot establish that the release of hazardous substances at the City landfills was caused solely by the act or omission of a third party "other . . . than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with" Alcan. 42 U.S.C. § 9607(b)(3). Nor has Alcan attempted to establish that it "exercised due

care" with respect to the hazardous substances it left to Mahler's disposal, 42 U.S.C. § 9607(b)(3)(a), or that it "took precautions against foreseeable acts or omissions" of Mahler and "the consequences that could foreseeably result from such acts or omissions," 42 U.S.C. § 9607(b)(3)(b).

■ Second, the statute requires Alcan to establish that "the release" of a hazardous substance at the City landfills "and the damages resulting therefrom were caused solely by . . . a third party." 42 U.S.C. § 9607(b)(3). Alcan cannot establish that "the release" was caused solely by third parties because, as we have determined, see *supra* at 189, Alcan's hazardous substance-containing waste was deposited in the City landfills. As to whether "the damages resulting [from the release] were caused solely by" others, Alcan asserts that the substances in its waste are not harmful, and therefore could not have caused any damages when released, (1) because they are insoluble and (2) because they are present in concentrations "below ambient".

With regard to solubility, Alcan does not explain why the fact that substances in its waste are insoluble makes them not harmful. If the contaminants are insoluble, presumably they have accumulated along with other contaminants in the soil at the City landfills, where they may, alone or in combination with other materials, create a health hazard. Moreover, as we have indicated, see *supra* at 184–185, CERCLA is concerned not only with releases into groundwater, but also with releases into any environmental media, including "land surface or subsurface strata". 42 U.S.C. § 9601(8) (definition of "environment").

■ Whether or not the contaminants in Alcan's waste are present in concentrations below "ambient"[14] is not dispositive here. Alcan may be able to show

---

**13.** Alcan's first affirmative defense incorporates the language of Section 107(b)(3).

**14.** Alcan compares the concentrations of hazardous substances in its waste with concentrations in air and various kinds of soil. Because Alcan's waste is water/oil emulsion, however,

the reason for the comparison between Alcan's waste and air and soil is not obvious. Moreover, if the contaminants in Alcan's waste are insoluble, presumably they will accumulate in the soil where they are deposited.

that the release of its waste alone, with below ambient concentrations of hazardous substances, would not cause the incurrence of response costs, and that the release of third parties' wastes by themselves would cause the incurrence of response costs. It does not follow, however, that the addition of Alcan's waste to the waste of third parties did not cause an incremental increase in response costs. Alcan has not met its burden of showing why the addition of a hazardous metal does not result in increased clean-up costs.[15] Because Alcan's waste contained hazardous substances, Alcan's waste contributed to the presence of hazardous substances at the City landfills and caused the City to incur response costs. That certain clean-up and response actions at the City landfills would not be necessary if Alcan's waste had been the only waste deposited there is a relevant consideration for apportioning liability during the damages phase of the proceedings before us, that is, in determining whether Alcan is entitled to contribution from other responsible parties.

Because the City has established the four elements of CERCLA liability, and because Alcan has not established an affirmative defense, the City is entitled to partial summary judgment against Alcan on the question of liability under CERCLA § 107(a)(4)(A).[16]

## V. Damages to Natural Resources

■ The City seeks a determination that Alcan is liable for damages to natural resources pursuant to CERCLA § 107(a)(4)(C), which provides that generators of hazardous wastes "shall be liable for ... damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." 42 U.S.C. § 9607(a)(4)(C).

As we have determined, see *supra* at 196, the City has established the elements necessary for a finding of liability against Alcan for response costs under Section 107(a) of CERCLA. The fact that hazardous substances of the type generated by Alcan have contaminated soil, groundwater and surface waters at and near the five landfills is sufficient ground to impose liability for natural resources on Alcan. *Id.* CERCLA defines "natural resources" broadly to include "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by held in trust by, appertaining to, or otherwise controlled by the United States ... [or] any State [or] local government...." CERCLA § 101(16), 42 U.S.C. § 9601(16). The City has shown that hazardous substances of the type generated by Alcan are present in the soil, groundwater, and surface waters surrounding each of the landfills. Gleason Aff. ¶¶ 5–9.

Section 107(f)(1) of CERCLA, however, expressly limits those who can assert a claim under Section 107(a)(4)(C):

In the case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) of this section liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State.... The President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages.

42 U.S.C. § 9607(f)(1). Thus, to maintain its claim under subparagraph (C), the City must show, in addition to establishing the elements of CERCLA liability under Section 107(a), that it is the "authorized representative" of the State of New York.

---

**15.** Alcan does not explain, for example, why the addition of a liquid oil/water waste containing 1 ppm insoluble cadmium compounds to soil containing a concentration of 1 ppm cadmium would not result in more than 1 ppm cadmium in the soil after the liquid part of the oil/water waste evaporates, runs off, or soaks into the ground.

**16.** We have previously determined that the City has standing as a governmental plaintiff pursuant to Section 107(a)(4)(A) of CERCLA. *City of New York v. Exxon Corp.*, 112 B.R. 540, 545 (S.D.N.Y.1990) (relying on prior reasoning in *City of New York v. Exxon Corp.*, 697 F.Supp. 677 (S.D.N.Y.1988)).

The City has been designated as the "trustee for natural resources" within the meaning of CERCLA. Section 107(f)(2)(B) of CERCLA provides:

The Governor of each State shall designate State officials who may act on behalf of the public as trustees for natural resources under this Act ... and shall notify the President of such designations. Such State officials shall assess damages to natural resources for the purposes of this Act ... for those natural resources under their trusteeship.

42 U.S.C. § 9607(f)(2)(B). Pursuant to this provision, the Governor of New York State designated the Commissioner of the New York State Department of Environmental Conservation ("NYSDEC") as trustee for natural resources within, belonging to, managed or controlled by the State of New York. See Natural Resources Delegation, dated July 8, 1988.[17] The Commissioner of NYSDEC, in turn, delegated to the Commissioner of the New York City Department of Sanitation ("NYCDOS") "the authority to represent in the [City v. Exxon] action the State's claims on behalf of the public as trustee for natural resources which have been or may be, injured, destroyed or lost as a result of the release or threatened release of hazardous substances at, to or from the Landfills." Id.[18]

Pursuant to this delegated authority, the City has recovered over $2 million in natural resource damages in the three consent judgments that have been approved by this Court settling the City's claims against thirteen of the original defendants in this action. See 744 F.Supp. at 478–79 (review of procedural history of this action). Thus, the authority to act as trustee for natural resources for purposes of this action has been duly delegated by NYSDEC, and that authority has been exercised by the City.

We conclude that Alcan is also liable, pursuant to CERCLA § 107(a)(4)(C), for natural resources damages at the five City landfills.

### VI. Joint and Several Liability

Having determined that the City is entitled to partial summary judgment against Alcan on the question of liability under CERCLA, we are left with the question of the appropriate measure of relief. The City seeks an order adjudging Alcan strictly, jointly, and severally liable for the response costs incurred by the City to date at the five landfills, totalling $2,404,407,[19] as well as for all future response costs at these sites, and for damages for injury to, destruction and loss of natural resources.[20] The City represents that, to date, it has spent more than $2.4 million in responding to the release of toxic wastes at the five City landfills, and it is anticipated that future response costs at these sites will entail substantial additional expenditures. Gleason Aff. ¶¶ 3–4, 10, Ex. B.

CERCLA liability is joint and several where two or more defendants have contributed to a single indivisible harm. See Shore Realty, 759 F.2d at 1042,

---

**17.** The Natural Resources Delegation was initially submitted to the Court in connection with Exxon's motion for summary judgment, which, in light of the consent judgment between the City and Exxon, was never decided. See Supplemental Affidavit of Christopher A. Amato, dated July 11, 1988, in Support of Plaintiff's Cross–Motion for Summary Judgment Against Exxon Research and Engineering Company, Inc., Ex. KK.

**18.** As indicated by the definition of "natural resources", 42 U.S.C. § 9601(16), CERCLA contemplates that "natural resources" may be "held in trust by ... local government."

**19.** Alcan has not challenged the City's response costs incurred to date as being "inconsistent with the National Contingency Plan", 42 U.S.C. § 9607(a)(4)(A). That is, Alcan does not contend that the City's choices of response actions were arbitrary and capricious. See United States v. Northeastern Pharmaceutical and Chemical Co., 810 F.2d 726, 748 (8th Cir.1986); United States v. Alcan Aluminum Corp., 755 F.Supp. 531, 542 (N.D.N.Y.1991).

**20.** The City is seeking both a judgment as to Alcan's liability for past response costs and a declaratory judgment as to liability for its as yet undetermined future response costs. In CERCLA actions for recovery of response costs, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).

n. 13; *Monsanto,* 858 F.2d at 171–73. The burden of establishing that harm is divisible rests on the defendant. *O'Neil v. Picillo,* 883 F.2d 176, 178–79 (1st Cir.1989), *cert. denied sub nom. American Cyanamid Co. v. O'Neil,* —— U.S. ——, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *Monsanto,* 858 F.2d at 172 (citing *United States v. Chem–Dyne,* 572 F.Supp. 802, 810 (S.D.Ohio 1983); Restatement (Second) of Torts § 433B (1965)). To meet this burden, Alcan had to establish that the environmental harm at the City landfills was divisible among responsible parties. *See Monsanto,* 858 F.2d at 172. Alcan has presented no argument or evidence on the issue of divisibility of harm. To the extent that Alcan may argue that imposition of joint and several liability is inequitable under the circumstances of this case, i.e., Alcan's limited degree of participation in the waste disposal activities at the City landfills, "such equitable factors are relevant in subsequent actions for contribution. They are not pertinent to the question of joint and several liability, which focuses principally on the divisibility among responsible parties of the harm to the environment." *Monsanto,* 858 F.2d at 171, n. 22.

██ In any event, the wholesale commingling of different generators' wastes by the Mahler companies precludes a finding that the harm in this case is divisible. The impossibility of distinguishing one generator's waste from another's at the City landfills is underscored by Mansfield's testimony:

> During the time period when Alcan's waste was being disposed of in the City landfills, liquid wastes from other generators were also being disposed of at these sites by the Mahler companies. In the course of disposing of liquid wastes at the City landfills, Alcan's waste was mixed with the wastes of other generators.

Mansfield 2/11/89 Aff. ¶ 17. Moreover, as the City's Director of Landfill Engineering testifies, it is scientifically impossible to determine the precise origin of any of the hazardous substances that have been detected at the City landfills. Gleason Aff.

¶¶ 5–7. Thus, the imposition of joint and several liability is appropriate. *See, e.g., United States v. Stringfellow,* 661 F.Supp. 1053, 1060 (C.D.Cal.1987); *United States v. Bliss,* 667 F.Supp. 1298, 1313 (E.D.Mo. 1987).

Neither party has addressed whether the City, as a potentially responsible party under CERCLA, may be jointly and/or severally liable with Alcan, or may be subject only to a contribution action by Alcan. We note that Alcan has filed a motion to amend its answer to assert a counterclaim for contribution against the City on the ground that the City's municipal wastes are primarily responsible for the harm to the environment at the City landfills. In addition, the City has conceded that, as the owner and operator of the landfills, it is a potentially responsible party under CERCLA § 107(a)(1). *City of New York v. Exxon Corp.,* 697 F.Supp. 677, 693 (S.D.N.Y.1988).

In addressing the consequences of a governmental plaintiff also being a potentially responsible party, one court determined that

> [t]he fact that [the governmental plaintiff] is a former site operator ... does not bar a finding of liability against the defendants nor bar recovery in this [section 107(a)] action. At a future proceeding on the contribution and counterclaims action ... the [governmental plaintiff] may be found liable as a former site operator and responsible for some portion of response costs incurred at the site.

*Western Processing,* 734 F.Supp. at 939–40; *see also United States v. Kramer,* 757 F.Supp. 397, 415 (D.N.J.1991). Thus, a Section 113 proceeding for contribution would be the appropriate forum to consider the government's liability for response costs. *Kramer,* 757 F.Supp. at 415. Whereas the liability of a third-party defendant (like the governmental plaintiff) is "several", the liability of the initial defendants sued by the government under Section 107(a), is "joint and several". *Kramer,* 757 F.Supp. at 414.

The court in *Amoco Oil* came to a different conclusion in considering the nature of liability among a responsible private plain-

tiff and a defendant. The court concluded that, "[a]s an owner of a facility that continues to release a hazardous substance, Amoco shares joint and several liability for remedial actions with Borden." 889 F.2d at 672 (citations omitted). Furthermore, whereas the court in *Kramer* was careful to keep § 107(a) and § 113(f) actions distinct, the court in *Amoco* apparently converts a § 107(a) action into a § 113(f) action when the plaintiff is a responsible party under CERCLA: "[w]hen one liable party sues another to recover its response costs, the action is one for contribution, which is specifically recognized under CERCLA. *See* § 9613(f)." 889 F.2d at 672. *See also PVO Int'l, Inc. v. Drew Chemical Corp.*, 19 Envtl.L.Rep. (Envtl.L.Inst.) 20,077 (D.N.J.1988).

It may be that *Amoco Oil* and *Kramer* come to different conclusions because one involves a private plaintiff whereas the other involves a governmental plaintiff. In any event, we do not reach at this time the question of whether the City should be considered jointly and/or severally liable, or subject only to a contribution counterclaim, but reserve decision until we decide whether Alcan may amend its answer to assert a counterclaim against the City.

## VII. Equal Protection

Alcan argues, for the first time in this action,[21] that the "selective" enforcement of CERCLA against it by the City (and the EPA)—i.e., prosecuting Alcan while assertedly not pursuing other allegedly more culpable polluters—violates the Fourteenth Amendment principle of equal protection of the laws. Even if Alcan had raised this argument in a timely manner, we would find it to be without merit. *See United States v. Alcan Aluminum Corp.*, 755 F.Supp. 531, 540 (N.D.N.Y.1991) (finding that Alcan had not established *prima facie* case of selective enforcement).

## VIII. Sanctions

The City moves for sanctions pursuant to Fed.R.Civ.P. 11 in connection with Alcan's motion for reconsideration. The City argues that the motion violates the Court's August 23, 1990 scheduling order ("Order"), and Alcan's legal arguments seriously misrepresent the case law on the issues it raises or ignore it entirely. We address these arguments in turn.

As to the purported violation of the Court's scheduling order, the City contends that Alcan did not limit itself, as the Order required, to "newly discovered evidence (not legal argument) which could not have been discovered prior to the Court's decision." Alcan's motion to reconsider was directed in large part to the issue of causation, an issue which Alcan implicitly raised in its initial motion papers by arguing that its waste is not a hazardous substance because the contaminants in it are present in concentrations below ambient. In other words, Alcan's initial papers may be read as having raised the issue of whether its waste, with only trace amounts of contaminants, caused the incurrence of response costs. As such, Alcan's motion for reconsideration on the issue of causation did not introduce new legal argument, but rather attempted to set forth, as required by Local Civil Rule 3(j), "the matters or controlling decisions which [Alcan's counsel] believe[d] the court [had] overlooked."

As to the City's charge that "Alcan's legal arguments seriously misrepresent the case law on the issues it raises, or ignores it entirely," City Oppos. Mem. at 2, we find this charge to be overstated. Although Alcan did not cite *New York v. Shore Realty* on the issue of causation, that case, though highly relevant and instructive, is not directly controlling here. While Alcan's papers are not a model of clarity and have been less than helpful in some respects, particularly its discussions of important scientific and technical issues, any other shortcomings in Alcan's papers are, we

---

**21.** A similar argument was made in an action currently pending in the Northern District of New York involving a hazardous waste site in Oswego County, New York. *United States v. Alcan Aluminum Corp.*, 87–CV–920. In his decision granting summary judgment to the United States, Judge McAvoy summarily rejected Alcan's constitutional challenges to the imposition of liability. 755 F.Supp. 531, 540 (N.D.N.Y.1991).

believe, attributable more to the complex nature of CERCLA and the cases interpreting it, than to a failure on the part of Alcan to comply with its Rule 11 obligations.

The City's motion for sanctions is denied.

## IX. Conclusion

Alcan's motion for reconsideration is granted, and, upon reconsideration, we adhere to our rulings in our prior Opinion. The City's motion for partial summary judgment on the issue of liability against Alcan is granted. Alcan is jointly and severally liable for the City's response costs incurred to date; it is hereby declared that Alcan is liable for the City's as yet undetermined future response costs, and for damages for injury to, and destruction and loss of, natural resources.

The Court reserves decision on the question of whether or not the City is jointly and/or severally liable with Alcan, or liable for contribution to Alcan, until after we have decided Alcan's motion for leave to amend its answer and assert a counterclaim for contribution against the City. The Court is inclined to grant Alcan's motion to assert a counterclaim against the City. The City has been on notice of Alcan's position with respect to the substance of the counterclaim throughout most of the protracted duration of this case, and we therefore see no prejudice to the City in allowing the counterclaim, the delay in filing notwithstanding. Because we had indicated to the City our willingness to hear argument on the matter, however, we will not decide the issue today, but hereby grant leave to argue the matter orally on *Wednesday, June 26, 1991 at 10:00 a.m.* in Courtroom 312. The Court will indicate at that time whether it will require any additional papers on the matter.

SO ORDERED.